**COHEN et al. v. JOHNSON et al.**
**Civ. A. No. 3076.**

United States District Court
M. D. Pennsylvania.
June 22, 1950.

See also D.C., 8 F.R.D. 37.

232

Edward W. Warren, of O'Malley, Harris, Harris & Warren, Scranton, Pa., J. Pennington Straus, of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Frederick E. Lark, Shamokin, Pa., John M. Smith, Jr., Philadelphia, Pa., for defendants.

MURPHY, District Judge.

■ In this diversity action, plaintiffs, of Rochester, New York,[1] t/a Rochester Fuel and Feed Company, engaged in the purchase and sale of anthracite coal, seek damages for breach of an alleged contract from defendants, of Shamokin, Pennsylvania, located in this district, co-partners t/a Bellaire Coal Sales, engaged in the purchase and sale of anthracite coal. The case was tried to the court without a jury. The operative facts occurred in Pennsylvania; we look to Pennsylvania law to determine the substantive rights of the parties. Newspaper Readers Service Inc. v. Canonsburg Pottery Co., 3 Cir., 146 F. 2d 963.

Plaintiffs assert a valid, definitive, binding contract of purchase and sale, which this court should enforce, was created when Morris Cohen and defendants executed a certain paper on July 1, 1947; failing therein, that such a contract may be implied

1. At the trial the plaintiffs upon motion were allowed to amend the name of the plaintiff from Morris Cohen to Morris Cohen, Jacob Cohen and Max Cohen t/a co-partners. Plaintiffs purchase and sell coal under the name of Rochester Fuel and Feed Co.; they also sell coal under the name of Pioneer Coal Co. and Black Diamond Coal Co.

in fact from plaintiffs' letter to defendants July 3, 1947, and defendants' conduct subsequent thereto.[2]

■ As to the paper executed July 1, 1947:

Defendants' source of supply and quality of coal varied. Having no mines of their own they purchased from truckers and independent miners. Defendants' plant and cleaning equipment was inferior to those of the larger coal companies. Defendants' coal was sub-standard as to size and impurities.

Plaintiffs and defendants first met when in June, 1947, one of defendants' customers at Rochester refused to accept delivery of a car of defendants' coal "because of quality and size". Plaintiffs purchased the coal at $5.00 per ton although the price at that time in the open market was $9.00 per ton.

Morris Cohen, after inspecting defendants' plant and product on July 1, 1947, advised them he desired to purchase some of their coal during the 1947–48 burning season. After discussing the amount of coal defendants would likely have available defendants quoted plaintiff a price per ton of $8.75 for stove and chestnut, $7.00 for pea. Plaintiff wrote some notes on the top sheet of defendants' desk memorandum pad, signed his name thereto, removed the sheet and asked defendants to sign their names thereto, stating he wanted something to show to his brothers. Defendants refused to sign, advising him they did not make a practice of doing so, that they were only quoting prices, and suggested that the word "quotations" be written across the top of the page. After plaintiff complied with this suggestion defendants affixed their signatures under that of the plaintiff and plaintiff took the paper.[3]

On the second sheet of defendants' pad plaintiff wrote a memorandum which he signed and gave to defendants.[4]

For some time prior and subsequent to July 1, 1947, the anthracite operators and miners were negotiating a new wage contract. It was generally known in the industry that the adjustment would be upward and that the wage increase would be immediately absorbed and reflected in the price per ton of anthracite coal. Plaintiff and defendants knew about this conference and the probable outcome. Defendants intended, and in our judgment Morris Cohen knew, that this increase would result in defendants issuing new quotations and that the increase would be reflected in the prices at which coal would be sold in the future by defendants to plaintiff and defendants' other customers.

From the testimony of plaintiff and other witnesses, we find that the general custom in the anthracite industry was not to enter into contracts for the sale of coal, wholesale, over any long period of time.

From time to time in the coal industry the seller changes price quotations according to the rise and fall of the market; the price at which coal is bought and sold is determined by the prevailing market price at the time of the particular order which the seller is free to fill at that price or to bargain as to the price.

When price quotations are made it is not considered in the industry as an offer of sale but as an invitation to the trade to submit orders—offers to buy—which may or may not be accepted.

Acceptance is indicated by shipping the coal. If shipment is not made within fifteen

---

2. In view of our findings it will be unnecessary to discuss the question of anticipatory breach or damages.

3. 4000 ton Stove 8.75
   4000 " Nut 8.75
   4000 " Pea 7.00
   from July 1st 1947
     to April 1, 1948
   Net Cash
         OK

      . Morris Cohen
      Frank O. Johnson
      Charles Mauer

4.        "July   1–47
  4000 ton Stove Coal)
  4000 " Nut  " ) $8.75
  4000 " Pea  " ) $7.00
    from July 1, 1947 to 1948
    Net Cash
       Morris Cohen"

days the order is considered cancelled.

It was defendants' intention to give plaintiffs quotations; an invitation to submit orders; not to enter into a firm contract for any specific amount of coal.

In its complaint and at the trial plaintiffs produced a paper purporting to be that executed July 1, 1947. We find however that the following changes had occurred therein:

(a) The top part of the paper containing the word "quotations" had been torn therefrom.

(b) "Sold to Roch. Fuel and Feed Co." had been inserted in a pinched manner in the upper left hand corner of the remaining portion of the paper. The date "July 1st 1947" was inserted. Over defendants' signature "Bellaire Coal Sales" was inserted.

All of the changes and alterations described in (a) and (b) were made by plaintiff in the defendants' absence without defendants' knowledge, consent, authority, ratification, or approval.

There was no contract entered into by the parties on July 1, 1947.

■ As to plaintiffs' letter of July 3, 1947:

Notwithstanding plaintiffs had only been given "quotations"; had knowledge of the custom and practice of the industry as to contracts; of the pendency of the wage and consequent price increase; of the kind of plant and equipment defendants owned, and of the quality of the coal; plaintiff upon his return to Rochester wrote defendants inter alia, "I was glad to place an order with you * * * coal is to be shipped * * * as ordered by us * * * We will pay for the coal upon receipt of * * * invoices * * * initial purchase of 10,-000 tons * * * will lead to a continuous volume of business * * *" "P. S. * * * arrange to ship * * * July * * * 8 cars stove coal * * * 8 * * * chestnut * * * 4 * * * pea * * *"

Plaintiff speaks of having placed an order; of making an initial purchase; the coal is to be shipped as ordered, and then asks defendants to arrange to ship 20 cars in July.

Defendants made no reply to plaintiffs' letter but proceeded to fill the order for 20 cars. One car of stove coal had been shipped July 2, 1947; a car of chestnut coal was shipped July 9, and later three additional cars. While the latter three cars were enroute Jacob Cohen on July 15 complained as to the quality of the July 2nd shipment and ordered defendants to stop shipments.

July 21 defendants informed plaintiffs they had reconsigned the three cars and advised "We will await your further instructions".

July 21 plaintiff wrote that relying upon representations as to quality they had " * * * purchased 10,000 tons of coal"; the July 2nd shipment was not as represented and further " * * * complete our shipments * * * July * * * ship for August * * * 8 cars * * * stove * * * 8 chestnut * * * 4 pea * * *" and asked for an analysis of defendants' coal.

July 23 defendants expressed surprise as to the impurities, advised they were not shipping their coal as standard coal, that an analysis would be made and forwarded, and " * * * await your pleasure as to resuming shipments * * *"

July 24 plaintiffs expressed regret over the unnecessary reconsignment, requesting defendants to complete shipment of the July and August orders.

Meanwhile the wage negotiations had been completed. The wage increase absorbed in the price of coal amounted to about $1.00 per ton. As soon as it went into effect defendants increased their prices accordingly and on August 29 sent a post card to plaintiffs quoting the new prices.

After the price increase was in effect, one Byron Sleppy, representing himself to be plaintiffs' agent, advised defendants to resume shipments at the new price. Regardless of whether or not Mr. Sleppy was in fact the plaintiffs' agent and had authority to make such representation, it was in reliance upon the Sleppy represen-

tation that defendants shipped a car of chestnut coal to the plaintiffs on August 26 at the new rate, i. e., $9.60 per ton.

August 29 plaintiffs acknowledged receipt of the new price quotations, ordered 8 cars of stove coal, 8 nut, 4 pea, for September and insisted all shipments be made at July 1st prices.

When plaintiffs refused to pay the new price defendants re-billed them at the old rate and stopped making shipments.

On September 26, 1947, the parties met and failed to adjust their differences. Plaintiffs thereafter sought damages for defendants' failure to ship the 10,000 tons.

We find as a fact that apart and distinct from the preliminary remarks made by plaintiffs in their letter of July 3, there was an offer made to defendants to purchase 20 cars of coal. Similarly as to the August and September orders.

Whatever plaintiffs' intent may have been as to making an offer to purchase 10,000 tons of coal in the letter of July 3 and subsequent correspondence, the offer was not accepted by the defendants. Defendants' silence and other conduct was not sufficient to indicate acceptance of plaintiffs' offer to purchase 10,000 tons of coal.

When defendants proceeded to fill plaintiffs' July order they were precluded from doing so by the order to stop shipments.

The shipment of August 26th was made by defendants, relying upon the representations of Mr. Sleppy.

Defendants had a right to refuse to accept plaintiffs' orders for August and September, and to refuse to accept plaintiffs' offer to purchase 10,000 tons of coal. There being no overall contract there could be no breach thereof, and therefore no damages.

■ "Whether the parties are merely negotiating a contract, or entering into a present contract, is purely a question of intention." Windsor Mfg. Co. v. Makransky & Sons, 322 Pa. 466 at 472, 186 A. 84, 86, 105 A.L.R. 1096.

■ "It is a fundamental and well recognized rule that in construing contracts, courts must look not only to the specific language employed, but also to the subject matter contracted about, the relationship of the parties, the circumstances surrounding the transaction, or in other words place themselves in the same position the parties occupied when the contract was entered into, and view the terms and intent of the agreement in the same light in which the parties did when the same was formulated and accepted." Miller v. Miller, 10 Cir., 134 F.2d 583, 588.

■ "That an offer is distinguished from preliminary negotiations is a fact well recognized in the law of contracts. Williston on Contracts (Revised Ed.) vol. 1, § 27, makes this statement: 'Frequently negotiations for a contract are begun between parties by general expressions of willingness to enter into a bargain upon stated terms and yet the natural construction of the words and conduct of the parties is rather that they are inviting offers, or suggesting the terms of a possible future bargain, than making positive offers. * * * Language that at first sight may seem an offer may be found merely preliminary in its character.' Section 25 of the Restatement of the Law of Contracts, reads as follows: 'If from a promise, or manifestation of intention, or from the circumstances existing at the time the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer.'" Upsal St. Realty Co. v. Rubin, 326 Pa. 327, 329, 192 A. 481, 482; and see comment a to § 25, Restatement of the Law of Contracts: "It is often difficult to draw an exact line between offers and negotiations preliminary thereto. It is common for one who wishes to make a bargain to try to induce the other party to the intended transaction to make the definite offer, he himself suggesting with more or less definiteness the nature of the contract he is willing to enter into. Besides any direct language indicating an intent to defer the formation of a contract, the definiteness or indefiniteness of the words used

in opening the negotiation must be considered, as well as the usages of business, and indeed all accompanying circumstances." And cf. Illustrations 1 and 2, e. g. "2 * * * The word 'quote' and the incompleteness of the terms indicate that the writer is simply naming a current price which he is demanding." See Vitro Mfg. Co. v. Standard Chemical Co., 291 Pa. 85, 139 A. 615; Edgcomb v. Clough, 275 Pa. 90 at page 103, 118 A. 610; Rissmiller v. Evangelical Lutheran Congregation, 268 Pa. 41, 110 A. 740; Brown v. Finney, 53 Pa. 373, 378 (a coal case).[5]

■ While an offer may be accepted by conduct (Gum, Inc., v. Felton, 341 Pa. 96 at page 102, 17 A.2d 386) to be a contract an offer must be accepted. An offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer. Baum's Estate, 274 Pa. 283, 117 A. 684; Restatement of Contracts, §§ 55, 72; 1 Williston on Contracts, Rev.Ed. § 91 et seq.

Plaintiffs' letter being contrary to and beyond the prior understanding, defendants' silence had no effect since they obviously declined to recognize any overall offer but construed it as an offer to purchase 20 cars of coal, which they proceeded to accept by making delivery.

■ "While it must be conceded that circumstances may exist which will impose a contractual obligation by mere silence, yet it must be admitted that such circumstances are exceptional in their character, and of extremely rare occurrence * * * it is difficult to understand how a legal liability can arise out of the mere silence of the party sought to be affected, unless he was subject to a duty of speech, which was neglected, to the harm of the other party. If there was no duty of speech, there could be no harmful omission arising from mere silence." Royal Ins. Co. v. Beatty, 119 Pa. 6, 9, 12 A. 607, 4 Am.St. Rep. 622; see also Berg Co. v. Thomas & Son Co., 256 Pa. 584, 100 A. 951; Kennedy-Stroh Corp. v. Davis, 72 Pa.Super. 381; and see 46 Am.Jur.Sales, § 50, p. 240.

■ "If either party knows that the other does not intend what his words or other acts express, this knowledge prevents such words or other acts from being operative as an offer or an acceptance." Restatement of the Law of Contracts, § 71 (c), and see comment a.

We accept the law as to implied contracts suggested by plaintiffs as outlined in Cameron v. Eynon, 332 Pa. 529 at page 532, 3 A.2d 423; Lion Yarn Co. v. Flock, 154 Pa.Super. 528 at page 534, 36 A. 2d 246; and see Restatement of the Law of Contracts, § 52, comment a, and § 45, and 46 Am.Jur.Sales, § 49, p. 239; but there was no implied contract here.

■ Where a question of whether a contract is divisible or entire arises, it is the intention of the party that controls and not the divisibility of the subject. Shinn v. Bodine, 60 Pa. 182. This intention is to be collected from the words employed where the intention can be clearly derived therefrom. Producers' Coke Co. v. Hillman, 243 Pa. 313, 315, 90 A. 144; McKeefry v. United States Radiator Co., 31 Pa.Super. 263; West Republic Mining Co. v. Jones & Laughlins, 108 Pa. 55.

■ "The mere fact that a transaction is set forth in one document is not alone sufficient to require the result that there is a single entire contract and not several separate contracts." 12 Am.Jur.Contracts, § 321, p. 876.

■ "No formula has been devised

---

5. In view of our findings we set to one side consideration of the effect of the changes made in the paper executed by the parties, as to which see 6 Williston on Contracts, Rev., §§ 1881, 1890, 1891, 1896, 1901, 1916, 1917; Restatement of Contracts, § 334; Craighead v. McLoney, 99 Pa. 211, 214; Newman v. Cover, 300 Pa. 267, 272, 150 A. 595; Cornog v. Wilson, 231 Pa. 281, 283, 80 A. 174; Bowman v. Berkey, 259 Pa. 327, 103 A. 49; Nesbitt v. Turner, 155 Pa. 429, 26 A. 750; Burke v. Harkins, 296 Pa. 414, 146 A. 94. Cf. Swank v. Kaufman, 255 Pa. 316, 99 A. 1000, L.R.A.1917D, 826; Loftus v. Miners National Bank of Pottsville, 308 Pa. 362, 162 A. 227.

which furnishes a test for determining in all cases what contracts are severable and what are entire. The primary criterion for determining the question is the intention of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question." 12 Am.Jur. Contracts, § 315, p. 870.

We adopt the above opinion as findings of fact and conclusions of law.

An order entering judgment for the defendants will be filed herewith.