## Pritchard's Appeal

*Herschel J. Richman,* for Commonwealth.

*Robertson B. Taylor,* for appellant.

WATERS, Member, May 24, 1972.—This matter comes before the board as an appeal from a decision of the Department of Environmental Resources to

spray a pesticide[1] over 810[2] acres of privately owned forest land located in Northampton County, Pa. The purpose of the proposed spraying is to control an expected attack by the Gypsy Moth[3] in the spring and summer of 1972.

This appeal of the Ecological Protection Society, Inc., a nonprofit corporation with an interest in preserving the environment of Northampton County, and an individual Haydon Pritchard[4] was filed alleging that they had been given no opportunity to be heard on the decision to use an aerial pesticide spray, that such spray was unsafe and that there were acceptable alternatives to deal with the Gypsy Moth problem. A supersedeas was requested by appellant, but at the hearing the parties agreed that, inasmuch as no spraying was contemplated in the area, before a final decision was rendered by this board, the supersedeas question was moot.

The law clearly provides that the requirements of due process are met so long as a hearing is provided at any stage in the proceeding before final action is taken.[5]

The Department of Environmental Resources (hereinafter called "Department") contends initially that the appellant, Ecological Protection Society,

---

[1] Dylox 80 percent S.P.A. + oil.

[2] Two areas, one composed of 610 acres and one composed of 200 acres. This is only a small part of the proposed 1972 Gypsy Moth Aerial Spraying Control Program in Pennsylvania which will cover seven counties and 23,000 acres.

[3] Scientifically known as Porthetria Dispar.

[4] Dr. Pritchard, who is vice president of the society, was not an original party, but was permitted by amendment to join the proceeding individually as a resident of the proposed spray area.

[5] Act June 4, 1945, P. L. 1388, (No. 275), approved December 3, 1970, P. L. 834, sec. 1921(c).

Inc. (hereinafter called "Ecological"), lacks standing to take this appeal. It is their position that, in any event, the proposed Gypsy Moth program is an environmentally safe and effective method of immediately dealing with a difficult infestation problem in Northampton County.

The pesticide problem was first brought into sharp focus in this country by Rachel Carson in her celebrated and (berated) book "Silent Spring." Despite the overwhelming evidence there presented of the danger of pesticide residues, public and governmental apathy often persist.[6]

Juxtaposed with the environmental impact of pesticides is the extremely destructive Gypsy Moth, which in its larval or caterpillar stage is an unsightly leaf-eater, whose population density rapidly increases[7] to a point at which it can in a few weeks denude an entire forest of oak trees.[8]

## FINDINGS OF FACT

1. The department has properly determined that there will be a heavy infestation of the Gypsy Moth in a certain area of Northampton County in 1972 and, unless some action is taken, substantial damage will result to many trees in the area.

---

[6] Congressman Jamie L. Whitten, of Mississippi, Chairman of the House Appropriations Sub-Committee on Agriculture, has stated: "The worst residue problem we have to face today is the residue of public opinion left by Rachel Carson's book, 'Silent spring.'"

[7] The female Gypsy Moth can lay up to 800 eggs in one season.

[8] It is estimated that over one half million acres will be defoliated in Pennsylvania this year. Only 23,000 acres will be sprayed Statewide.

2. The Gypsy Moth, in one of its stages of development, is an unsightly, defoliating, destructive, prolific pest.

3. Appellant, Haydon Pritchard, a naturalist and nearby resident of the proposed spray area, has substantial interest in maintaining and preserving the natural environment of the proposed spray area. Ecological Protection Society has not shown such interest.

4. On February 18, 1972, the department notified the County of Northampton of its finding evidence of Gypsy Moth infestation and offered to finance two-thirds of the cost of a project to use an aerial spray over an area of the county, with the cooperation of the county, to control the Gypsy Moth.

5. The County of Northampton by resolution of March 16, 1972, and by various methods including regular mail, radio and newspapers, attempted to advise the owners of the 1,975 acres (known as spray areas 8 and 9), of the proposal, and to elicit objections from those opposed to having their property sprayed.

6. As a result of objections and complaints received from Bangor Water Company and Blue Mt. Consolidated Water Company, the intended spray area was reduced from 1,975 to 810 acres.

7. Some residents of the proposed spray area did not receive adequate personal notice of the intentions of the department and the county to spray the area.

8. The department proposes to spray from helicopters Trichlorfon, a chemical formula produced by Chemagro Corporation and known as Dylox (80 percent.)

9. The formula which the department proposes to use is not fully registered with the Federal govern-

ment[9] for use against the Gypsy Moth, although another formula, (U.L.V.), which has basically the same properties,[10] is so registered.

10. The formula Dylox (80 percent) has been used in small test areas, and in 1972 it was given a temporary registration which permits its use in larger test areas. This is the procedure whereby information on the effects of a chemical pesticide is obtained which can then be used to apply for full registration of the pesticide for use against the Gypsy Moth.

11. The proposed spraying in Northampton County is intended to accomplish not only the immediate control of the Gypsy Moth infestation, but also will be used as part of a program to gather additional scientific information on the environmental impact of the Dylox (80 percent) formula when used over a large area.

12 There is some scientific evidence which indicates that the formula of Dylox (80 percent) can persist in the environment up to 126 days on leaf litter; can produce a product called Vapona upon chemical breakdown which can be five times more toxic than the original formula: It (Dylox) can deplete the immediately available food supply for certain birds and cause them to leave the area, and, when used contrary to directions, can have discomforting effects on humans.

13. Although all studies to date of the effects of Dylox (80 percent) indicate that it is, when properly used, an effective measure (95 percent) to bring the

---

[9] Presently with the Environmental Protection Agency. Registration of pesticides was formerly required with the United States Department of Agriculture, Division of Pesticides.

[10] There is, nevertheless, some testimony which indicates that there are substantial differences in the environmental effect of the two formulas.

Gypsy Moth under rapid temporary control, without known major or long-term detrimental effects on the environment, other treatment methods appear to be more promising as permanent solutions to the Gypsy Moth problem.

14 More scientific information is needed on the long and short-range effects of the Dylox formula (80 percent) on aquatic insects, certain birds and wildlife and the environment generally.

15 The Bushkill Watershed Association of Northampton County passed a resolution May 5, 1972, opposing the aerial spraying of the chemical pesticide as proposed, in the confines of the Bushkill Watershed.

## CONCLUSIONS OF LAW

On the basis of the foregoing findings of fact, the Environmental Hearing Board concludes as follows:

1. The Environmental Hearing Board has jurisdiction in this case.

2. The individual appellant, Haydon Pritchard, has standing to take this appeal; the Ecological Protection Society, Inc., does not.

3. The burden of proof is upon appellant, to show that the decision of the department is arbitrary, unreasonable, unsafe or, for some reason, not properly directed to solve the problem for which it was designed, and is, therefore, an abuse of discretion.

4. Appellant has failed to present evidence sufficient to require a reversal of the decision of the department, except as indicated hereinafter.

5. Notice of the proposed spraying given to residents of the proposed spray area was inadequate.

6. Objections to the spraying raised by and in the area of the Bushkill Watershed Association are reasonable and must be considered.

7. Under authority granted by the Act of December 3, 1970, P.L. 834, sec. 1902-A(4), the Department has the right to spray the pesticide Dylox (80 percent) for the emergency treatment of Gypsy Moth infestation in the proposed areas of Northampton County, excluding, however, a part of the Bushkill Watershed.

## DISCUSSION

To spray or not to spray, that is the question. This is the first major case involving the large scale use of pesticides in the environment, to come before the board. The case is both unique and thorny, because it presents a situation in which even the conservationists and environmentalists are divided among themselves.

To spray is to place into the air, by which we all live, a chemical pesticide which has not been registered by the Federal government and all of the results of which are not fully known to science. Not to spray is to abandon large segments of our beautiful wooded recreation and residential areas in Northampton County to the ugly, rapidly multiplying Gypsy Moth, which will surely damage and kill thousands of trees if not immediately checked.

This appeal was brought by a corporation, the Ecological Protection Society, and Dr. Haydon Pritchard, an individual. We find that only Dr. Haydon Pritchard has standing, because of the uncertainty of the membership of the corporation: Sierra Club v. Morton, No. 70-34 U. S. Supreme Court (1972), Environmental Hearing Board Rule 6(b).

In Committee to Preserve Mill Creek et al. v. Secretary of Health, et al., 3 Com. Ct. 200, the court denied standing to an organization which had described itself as a "a group of citizens . . . concerned with the preservation of the Mill Creek Valley and its

flood plain as a public asset." The court there said, after finding that the individual appellants did have standing:

"The Committee to Preserve Mill Creek is on an entirely different footing. It is not the owner of land near the site and it it is not the authorized agent of any such owner and cannot, therefore, in the legal sense be aggrieved by the grant of the permit or have a direct interest in the denial of the appeal to the secretary. See Cleaver Appeal, 24 D. & C. 2d 483 (1961)."

The department proceeds under the powers and duties given to it by Act 275, sec. 1902-A(4), which is an amendment to The Administrative Code of April 9, 1929, P. L. 177. That law specifically imposes upon the department the duty ". . . to protect all forest land in the State from . . . , insects, and other enemies, to promote and develop forestry and know-ledge of forestry throughout the State." In addition, the department is authorized to "promote and advance any other activity in local forestry which the Department may deem helpful to the public interest."

It is, therefore, clear that the Gypsy Moth program is an exercise of the police power of the State. The police power, which authorizes a State to make all laws for the general health, welfare and safety of its citizens[11] is, of course, not unlimited. The laws must not be unduly oppressive and the means employed must have a real and substantial relation to the objects sought to be attained.[12]

Inasmuch as there is a presumption in favor of the

---

[11] Buffalo Branch Mutual Film Corp. v. Breitinger, 250 Pa. 225.

[12] Commonwealth ex rel. Woodside v. Sun Ray Drug Co., 383 Pa. 1.

propriety of the actions of government officials, the burden of proof is clearly upon appellant to show that proposed Gypsy Moth program is not a proper exercise of the authority granted.

Investigation by the department and previous experience has shown that, by all indications, Gypsy Moth infestation and damage will be great unless some immediate treatment is undertaken. Although there is some question about the predictability of future damage of the Gypsy Moth,[13] there is no serious dispute about the heavy temporary damage that it can inflict.

The question then becomes: Is the department's proposal reasonable under the circumstances?

As might be expected, it is at this point that the battle of the experts begins in earnest.[14]

Let us examine the alternatives debated at length.

The various alternative treatment methods available include the following:

A. *Ground Spray.*

Here the time and cost involved, as well as the fact that there is less control of the quantity of spray placed on each tree, make this method less desirable.

B. *Painting the Eggs With Insecticide.*

This process is even more painstaking and difficult than the ground spray operation. It takes a trained eye to find the eggs and many are missed altogether.

---

[13] Some evidence indicates that, after two years, there is no real threat to trees. Many trees put out leaves again within a few weeks and the attack can hardly be discerned. See Ehrlich & Holdern "The Gypsy Moth Backlash," Saturday Review, October 2, 1971, page 71, and Hinckley "The Gypsy Moth," Environment, Vol. 14, no. 2, March 1972.

[14] Witnesses included experts in entomology, biology, forestry, toxicology, geology, chemistry and botany.

Over a large area, the total result would not be satisfactory.

C. *Bacillus Thuringiensis (Bt).*

A bacteriological spray is itself still undergoing tests to determine its long-range effects. It is a promising alternative but not yet fully registered for use over large areas.[15]

D. *Banding.*

This control method, which requires a band to be placed around the tree to prevent the moth in its caterpillar stage, from returning up the tree after it once leaves, might be ideal to protect a few important large backyard shade trees, but is impractical over a forest.[16]

E. *Allow Gypsy Moth to Run Natural Course.*

This is an alternative that has had varying results in different areas. The department has elected to treat this area because it is used for both recreational and residential purposes. Many thousands of unused forest acres where some damage is expected will go untreated.

Much testimony related to the problem of "drift" of the pesticide while being sprayed from the air.

Indeed, the major complaint of appellant, Dr. Pritchard, a biologist, was not about the use of the pesticide Dylox but the method of aerial, as opposed to a ground, spray application.

We find that the detailed safety precautions to be

---

[15] This list does not purport to be exhaustive. As recently as May 4, 1972, the Pittsburgh Post-Gazette reported that Dr. William G. Yendol of Penn State University claimed the development of a new Gypsy Moth killer. It is a virus called nuclear polyhedrosis.

[16] The chemical Sevin used extensively in the past would presumably meet with some of the same objections as Dylox (80 percent). It also has an adverse effect on honey bees.

used at the time of spraying[17] are adequate, with one exception. It was indicated that there were no plans to notify hikers or others entering the spray area while the operation is taking place. This omission we find to be unreasonable.

An important conclusion reached from the lengthy expert testimony in this case was that each witness was found to be well qualified in his field, candid and credible. Inasmuch as the opinion testimony was to some extent contradictory, at first blush this would appear to further complicate the matter and defy solution. In fact, it leads directly to our resolution.

The major difficulty faced by each expert witness was the fact that there is limited information available on the long- and short-range effects of the pesticide formula in question upon the soil and water of a large forest area. Testing is, after all, the very heart of the scientific process, and very little testing has been done over large areas with this formula.[18] In their excellent study, Aerial Application of Insecticides for Control of the Gypsy Moth, C. C. Doone and P. W. Schaefer,[19] after finding the formula of Dylox

---

[17] Spraying will take place only in the early morning hours, will cease if the wind goes above five mph, and will be controlled both from the air and the ground. The spray nozzle to be used appears to give excellent and safe control of the quantity and direction of spray. Some drift is expected and desirable in an effective operation. The amount of pesticide to be used is equivalent to one pound per acre.

[18] There have been a number of laboratory tests with this formula and extensive outdoor testing with Dylox (U.L.V.). The tests that have been conducted with this formula indicate that, although there are some differences in their environmental effect, there is no evidence of either causing major harmful effects. The Dylox (U.L.V.) formula has been found to be harmful to the paint on certain cars.

[19] Department's exhibit II.

(80 percent) about 99 percent effective against the Gypsy Moth, concluded ". . . the effect of systematic insecticide coverage on large townships appears detrimental to some birds, particularly to any nestlings which require considerable amounts of food at a time when the insect biomass has been decimated. *This bird-insect control relationship should be studied in depth.*"

The need for additional testing of the Dylox formula is one reason why it is important to Chemagro and others[20] that this Gypsy Moth program go forward. More information is needed about the environmental effects of the spray other than upon the Gypsy Moth.

The only way new information can be obtained is by further testing. To prohibit this is to choke off at its inception the attempt to develop what could be an extremely effective, safe, emergency weapon in man's fight against the Gypsy Moth.

Therefore, it is the very paucity of scientific information with which appellant's expert witnesses were faced which made it impossible for appellant to carry its burden of proof: Upper Darby National Bank v. Finnegan, 68 Dauph. 53, vol. 1, P.L.E. Adm. Law, 83. In effect, he could not prove the environmental harm of the proposed spraying would outweigh the benefits involved, because there is still much that can only be learned by further large scale testing.[21]

As the testimony indicated, the Dylox (80 percent)

---

[20] There will be observers from the United States Forest Service who will gather information from the project.

[21] The United States Department of Health, Education and Welfare Secretary's Commission on Pesticides and their Relationship to Environmental Health, Report (1969) found after a thorough review of scientific literature that additional research needs are urgent and irrefutable. (Mrah Report).

formula in question was not yet fully registered because additional information first had to be gathered from large area tests and submitted to the Federal government.[22]

If each State were to completely prohibit any further aerial spraying of this pesticide formula, until it is fully registered, then the very information needed to obtain registration would be put beyond reach. It would, in effect, be a vicious circle, held together by a Gordian knot.

We conclude that appellant has failed to offer substantial evidence to support his allegation that the proposed spraying will be detrimental to the health, welfare and safety of the residents of Northampton County.

One final matter requires our attention.

Although form letter notices of the proposed pesticide spraying operation were sent to residents in the spray area, and other attempts were made to notify the property owners of the project, the testimony nevertheless shows that some residents were not previously, properly or adequately notified.

The requisites of due process are just as applicable in administrative proceedings as in judicial proceedings: Bridgewater Borough v. Pennsylvania Public Utility Commission, 181 Pa. Superior Ct. 84, West Penn Power Co. v. Pennsylvania Public Utility Commission, 174 Pa. Superior Ct. 123.

The most basic of rights and, indeed, the very cornerstone of our Constitution (Williams v. Yellow Cab Co. of Pittsburgh, Pa., 200 F.2d 302), is the requirement of due process. The keystone of due process is notice, and opportunity to be heard: National

---

[22] Laboratory tests and tests on areas up to 200 acres have already taken place without major deleterious effects.

Automobile Corporation v. Barfod, 289 Pa. 307. Here, we have the prospect that a property owner may have his trees sprayed with a pesticide without his knowledge, let alone his consent. Clearly, this cannot be permitted.

The letters which were sent to residents of the area, calling for a response only if the property owner objected to the proposal, is just another way of trying to exhume the now discredited doctrine of silence being construed as consent: Cohen v. Johnson, 91 F. Supp. 231.

In the same vein is the plan to spray at an appointed hour with no notice being given to persons who might for various legitimate reasons find themselves in the spray area at that time. We do not propose the impossible, but we do insist that every reasonable measure be taken to give actual personal notice to all persons who may be affected by the proposed aerial spraying.[23]

Finally, appellant and Bushkill Watershed Association indicated that they are opposed to spraying in the area covered by the watershed. Its boundaries, however, are somewhat inexact. We feel that, inasmuch as there is some dispute as to the effect of

---

[23] The letter sent by the County Commissioner to residents in the spray area stated, "The spray materials to be used are safe to humans, . . . wildlife . . . with the possible exception of small outdoor goldfish or similar backyard type fish ponds." We note that, under the terms of the agreement between the county and the department, it is the county's responsibility to give notice to residents. This requirement, however, is of constitutional magnitude, and both governmental bodies must be held equally responsible for its observance. The two entities may agree between themselves how this duty is to be carried out and by which government entity. As to a citizen vis-à-vis the government, however, this duty to give notice is imposed jointly and severally on the county and State and, as such, is nondelegable.

Dylox (80 percent) on certain aquatic life, and since the headwaters of the little Bushkill Creek run far beyond the confines of the spray area and the spray area was previously altered substantially to delete other property where large amounts of water are located from the spray proposal, we believe aerial spraying over this area should be prevented.

## ORDER

1. The department or the County of Northampton shall give individual written notices by certified mail or personal service to each resident of the proposed spray area. The notice shall indicate the approximate date and time of spray and any special precautions deemed appropriate.

2. The department shall conspicuously post at least one notice along each road leading into the spray area, containing the same information required in the notice to residents. One hour prior to spray, during spray and until one hour thereafter, the mainly traveled roads entering the area shall have located at their entrance point a person to give notice of the spraying operation to incoming persons.

3. The department may air spray with Dylox (80 percent) all of the area indicated on proposed spray charts offered into evidence as department's exhibits 1 and 2, marked as areas 8 and 9, with the following exception in area 8:

4. The department shall not spray the area referred to generally as the headwaters of the Little Bushkill Creek, and shall use Legislative Route 48088 as the northernmost boundary of said headwaters area. No spraying shall be carried out in area 8 to the south of Legislative Route 48088.

5. A summary of any scientific conclusions

reached after a follow-up study of the spray area shall be made available to the board and to appellant.

## CONCURRING OPINION BY
## GERALD GOLDBERG

GOLDBERG, Member, May 24, 1972.—I concur in the decision and order of my colleague, the Hon. Paul E. Waters.

The Federal Insecticide, Fungicide and Rodenticide Act, (7 U.S.C. §§135-135 k, ("FIFRA"), provides for the establishment of maximum tolerances for residues of those chemical substances which are commonly called pesticides. The criteria employed in determining whether a pesticide is safe for use in a public area were first adopted by the Seventh Circuit Court of Appeals, in Nor-Am Agricultural Peoducts, Inc. v. Hardin, 435 F.2d 1133 (July 15, 1970), vacated on other grounds en banc, 435 F.2d 1151 (Seventh Cir., November 9, 1970). The test used was drawn from the Legislative History of the 1962 amendments to the Food, Drug and Cosmetic Act, which provided, in effect, that a pesticide may not be used if it presents an "imminent hazard to the public." Such a hazard is deemed to exist when the evidence is sufficient to show that use of the pesticide poses a significant threat of danger to health, or otherwise creates a hazardous situation to the public, that should be corrected immediately to prevent serious injury, and which cannot be permitted to continue during the pendency of administrative proceedings. The type, extent, probability and duration of potential or actual injury to man, plants and animals are measured in light of the positive benefits accruing from use of the responsible pesticide in human or animal disease control or food production.

This general standard has been adopted by Pennsylvania law, and all uses of pesticides in Pennsylvania, including that by the Department of Environmental Resources, are subject to approval by the responsible State agency, which is the Pesticide Committee of the College of Agriculture of Pennsylvania State University. Detailed criteria for each type of pesticide and for each proposed use thereof have been established by the committee, and the specific plan of the department for the proposed 1972 Gypsy Moth Aerial Spraying Control Program has been submitted to and approved by the Penn State Pesticide Committee. In fact, the details of the program, which is predominantly a biological control program rather than a spraying program, were worked out in direct consultation with personnel of the Penn State Pesticide Committee.

Ideally, of course, it would be a wonderful world if it were unnecessary to resort to any pesticides, or if biological pests could be destroyed on a highly selective and nonpersistent basis. Research work toward this end is proceeding apace; at the United States Department of Agriculture experimental station at Beltsville, Md., a great deal of experimental work has been proceeding in the use of neutered male parasites, X-ray and chromosone technology, and other nonpesticide means of controlling insect pests. Unfortunately, at the present time, this research work has not been brought to a practical or commercial stage. The biological control portion of the overall Gypsy Moth plan is an extension of a successful program which has been in effect in the State of New Jersey for several years. The use of spraying, which is the subject of the matter presently before us, is but a minor part of the overall program, involving a mere 810 acres of a program which will cover seven

counties and 23,000 acres in the Commonwealth in 1972. All authorities agree that the limited and highly selective use of pesticide application must continue on an emergency basis, or in areas where the experimental use of biological controls cannot be depended upon to save valuable stands of commercial timber or valuable recreation areas. No responsible authority at any level of government, or in the scientific community, has, to my knowledge, disputed the necessity for such topical limited applications as those proposed by the department as an ancillary part of its overall control program.

With the order as modified by my brother, Mr. Waters, I conclude that there is no appreciable risk whatsoever to the public health, welfare or safety as a result of the proposed program and that, pending the results of future research, there is no alternative but to use the existing technology, with prudence, discretion and constant concern for human welfare, in fighting the battle against those biological enemies of man which threaten his health and well being.

## CONCURRING OPINION BY
## MICHAEL H. MALIN

MALIN, Chairman, May 24, 1972.—I concur in the order made by my colleague, the Hon. Paul E. Waters, but I arrive at the same conclusion by a different route. The emergency nature of this adjudication does not permit a formal presentation and detailed analysis of my differences and agreements with my colleague.

Gypsy Moth spraying, to be effective, must be done the last week in May and no later than the first few days in June when the larvae hatch. This is the first day of the last week of May.

The burden is on appellant to show that the deci-

sion of the Department of Environmental Resources to spray the areas in question was arbitrary, unreasonable and/or a menace to the public health, safety and welfare. We must proceed, however, from the assumption that the use of any chemical in a natural environment may lead to unforeseen consequences. The department implicitly recognizes this in its statewide program by limiting the area in which it will spray, 23,000 out of the 500,000 acres, which it believes will be infested by and subject to defoliation by the Gypsy Moth. Also implicit in the department's action is the belief that, if left sufficiently alone, the Gypsy Moth will come into balance with the ecology through natural control by predators, diseases and exhaustion of food supply.

The decision to spray was brought about largely by the belief that recreational areas in northeastern Pennsylvania must be kept from defoliation because of the importance of the recreation and tourist industry located there to the economy of Pennsylvania. The reasoning and/or experience appears to be that people will not spend tourist dollars in defoliated areas crawling with allegedly ugly Gypsy Moth caterpillars which can make one's presence in the infested area at least pyschologically unpleasant.

Accordingly, the department is spraying only in the so-called "high use" areas, and in what it calls "barrier" areas in an attempt to prevent further spread of Gypsy Moth infestation. It is also experimenting with new pesticides. This is a "barrier" case, with a pesticide called Dylox, requiring field testing.

The department's decision was cautious and considered:

1. The ecological factors involved in spraying insofar as known;

2. The ecological factors involved in not spraying;

3. The possible economic cost of not spraying;

4. The desire of many in infested areas to be rid of creeping, crawling creatures which appear unsightly to them and which can overwhelm residences and recreation areas and may be found at every turn of the head.

Nonetheless, it is my judgment that despite the presumption of validity to be given to an administrative decision, a decision to spray chemicals in a natural environment where the possibility of contamination of water supply, damage to wildlife systems, and ingestion or absorption by human beings is present, the presumption should disappear when any evidence of possible adverse ecological effects is introduced. Such evidence was introduced in this proceeding. This evidence includes, but is not limited to, the dire warnings on the Dylox label, the Department of Agriculture's conclusion that Dylox is an unacceptable alternative to other sprays, the admitted fact that it does kill certain aquatic insects and the fact that it is a nerve toxin.

I would, therefore, conclude that the department in this or similar cases has the burden of showing that the risks of using a relatively untested pesticide are acceptable in the light of the benefits to be derived.

The evidence adduced herein further indicates:

1. That Gypsy Moth defoliation lasts only a few weeks, and the trees will refoliate with nascent green leaves in late July and August, if sufficient moisture is available.

2. The forests most affected are monoculture oak forests, where oak timber mortality may even be desirable in order to have a more balanced forest.

The area in question is not a commercial forest where timber mortality would cause economic loss.

3. Even the loss of 60 percent of the oaks would not be a disaster because of the presence of low shrub and berry foliage which would provide feed for animals such as deer, pheasant and quail to a greater extent than the tall oaks. Shade-needing animals would not be affected.

4. The Gypsy Moth may be beneficial to birds which feed on the larvae and caterpillars. Indeed, there is some evidence that the wild turkey population is increasing because of the Gypsy Moth.

5. The necessity for experimentation with Dylox as a method of control may be of marginal importance because of the highly satisfactory results being achieved with bacterial sprays which are nontoxic and affect only the Gypsy Moth.

6. Dylox kills some enemies of the Gypsy Moth as well as the Gypsy Moth.

7. Of the 61,647 acres of forest land in Northampton County, approximately 610 will be sprayed under this board's order and, furthermore, spraying will be prohibited in the Bushkill Watershed.

8. The possibility of harm to human beings, other than some discomfort and irritation even if all the spray in the quantity proposed to be used were to descend on adjoining population centers is virtually nonexistent.

9. The experimentation with Dylox may indicate that it can be safely used in future Gypsy Moth "emergencies" where nontoxic type treatments were not properly or effectively used.

10. The threat of the Gypsy Moth to the overall ecology is probably exaggerated.

11. The spraying sought to be done will likely have little effect on the spread of the Gypsy Moth as

it goes on its southerly course from and along the Blue Mountain ridge.

12. The most careful and competent aerial spraying can, nonetheless, lead to spray settling in areas where spraying is unwanted.

13. The department has hired highly competent and experienced contractors with the necessary control equipment to do the spraying.

I conclude that, because the risk to humans is minimal and the area to be sprayed is of such small size and with such a small potential for ecological damage under the most adverse conditions which are conceivable, it is not within the power of this board to say that the department has not sustained its burden of showing:

1. That it has a valid object in spraying; i.e., developing an ecologically acceptable nontoxic spray to use in the future when there is deemed to be a Gypsy Moth "emergency," especially in high use recreational areas of economic importance to the Commonwealth;

2. The spraying presents little or no danger to those living in the area of the spray;

3. The possibility of creating ecological imbalances in the larger region is virtually norexistent in and around the spray area.

The additional safety measures required by my colleague will further minimize the already small possibility of harm to humans.

I disagree that the Ecological Protection Society lacks standing before the board because of our newly adopted Rule 6(b) negating the necessity for a proprietary interest to intervene in a proceeding. I would at least consider it an intervenor.

I join in Mr. Waters' order.