**Arthur and Kathleen BROWNE**

v.

**Otis MAXFIELD and Westinghouse Broadcasting and Cable, Inc.**

**No. 85–1927.**

United States District Court,
E.D. Pennsylvania.

Jan. 12, 1987.

Richard C. Senker, Norristown, Pa., for plaintiffs.

Edward W. Mullinix, Sherry Swirsky, Philadelphia, Pa., for Otis Maxfield and Westinghouse Broadcasting and Cable, Inc.

Samuel E. Klein, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for Anthony C. Lame (3rd Pty. Witness).

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This case presents tort and contract claims arising from employment negotiations in March 1984 between plaintiff Arthur Browne ("Browne") and defendant Otis Maxfield ("Maxfield"), acting as Vice President and General Manager of Philadelphia television station WKYW ("KYW"), a station owned by defendant Westinghouse Broadcasting and Cable, Inc. ("Westinghouse"). Defendants have moved for summary judgment. For reasons set forth below, defendants' motion shall be granted in part and denied in part.

## I.

In ruling on a motion for summary judgment, we must keep in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and that "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Nonetheless, the judge is to determine whether, in light of the burden of proof at trial, "there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," *id.* at 2511.[1] With those standards in mind, we address the facts of this case.

When the negotiations began, Browne was employed by WDVM–TV ("DVM") in Washington, D.C., as managing editor of its news division; his family lived in Yardley, Pennsylvania. The negotiations took place over a period of several days, in person and by telephone.

On March 22,[2] Browne had interviews in Philadelphia with, among others, Maxfield and Joel Rose ("Rose"), a consultant to KYW in its search for a news director, to discuss the possibility of joining KYW as news director.

On March 27, Browne had a telephone conversation with Rose. In that conversation, Rose asked Browne "what he would want" by way of salary and other benefits. Browne replied hat he wanted a salary in the range of $75,000 to $125,000 per year, a furnished apartment near the station, and two VCRs. Rose then asked Browne to

---

1. The difficulties inherent in this standard have been well canvassed, *see Anderson, supra*, 106 S.Ct. at 2515 (Brennan, J., dissenting).

2. All dates are in 1984.

come to Philadelphia that evening for a second meeting, at the home of Peg Braveman ("Braveman"), a KYW employee.

At that evening meeting, attended by Braveman, Rose, Maxfield, and Browne, Maxfield seemed very enthusiastic about Browne, repeatedly telling Browne "you're my guy" and "I'm your prince." Browne testified that he knew the deal would not be finalized until after he met with Larry Fraiberg, president of Westinghouse's television station group, but that he understood sometime in the course of the March 27 meeting that the job was his.[3] Browne also testified that he knew that Maxfield had a meeting scheduled with Fraiberg on Friday, March 30, and that Maxfield would discuss Browne with Fraiberg at that meeting. Browne stated that the Friday meeting was just for "protocol," but upon questioning, he conceded that it could happen that Fraiberg would tell Maxfield at that meeting that Browne was "just completely undesirable ... as a candidate for this job." Browne further stated that Maxfield told him that he would call him after the Friday meeting with Fraiberg.

On March 30, Maxfield called Browne to say that he had met with Fraiberg. Maxfield told Browne that he should come to New York the next day to meet with Maxfield and Fraiberg, and that after the meeting Browne and Maxfield would "finalize the deal." During that conversation, Browne expressed concern that Dave Pearce ("Pearce"), his boss at DVM, might hear through the grapevine that Browne was taking the job at KYW before Browne had a chance to tell him in person. Browne asked Maxfield if he could call Pearce and let him know that he would formally resign on Monday, April 2. Maxfield said, "OK. Do it." Browne reached Pearce and told him later that day.

On March 31, a meeting took place between Fraiberg, Maxfield, and Browne in New York. Browne emerged from the meeting without the job. Browne appears to have assumed that Maxfield continued to support him, and that Fraiberg made the final adverse decision. Browne and Fraiberg both testified, however, that Maxfield himself decided after the meeting that he had been wrong about Browne, and that Maxfield withdrew his recommendation of Browne for the position.

On April 2, Browne returned to DVM, and told Pearce that at that point he did not have the KYW job and might want to stay on at DVM. Pearce decided to let him stay.

On April 9, Pearce and Browne had a heated argument about a decision Browne had made. Pearce fired Browne.

## II.

Count II of the First Amended Complaint, which names Westinghouse as sole defendant, alleges that Browne and KYW formed an oral contract for employment, and that KYW breached the contract "by not hiring Art Browne." Defendants argue in their motion for summary judgment that the pleadings and evidence fail to support the existence of an oral contract. In the alternative, they contend that even if an oral contract was formed, it was a contract for employment terminable at will, and that their actions therefore did not constitute a "breach" of the employment contract.

We shall first address defendants' contention that no contract was formed.[4] The existence and terms of an oral contract must be established by "clear and precise" evidence. *Orchard v. Covelli*, 590 F.Supp. 1548, 1556 (W.D.Pa.1984); *Kassab v. Ragnar Benson, Inc.*, 254 F.Supp. 830, 832 (W.D.Pa.1966). Defendants stress that "[o]ne of the elements required to prove the existence of a binding contract is that the rate of compensation be clearly established." *Kassab, supra*, 254 F.Supp. at 832. They argue that because no definite salary figure was mentioned, no contract

---

**3.** Browne's understanding of Fraiberg's role is a strongly contested factual issue, and will be dealt with at length.

**4.** The parties have assumed the Pennsylvania courts would apply the substantive law of Pennsylvania to this case. As this assumption is not unreasonable, we shall follow it here.

was formed. We disagree. In *Seiss v. McClintic-Marshall Corp.*, 324 Pa. 201, 188 A. 109 (1936), the Pennsylvania Supreme Court stated that "[i]n order that a contract may be enforceable the promise or the agreement of the parties to it musı, be certain and explicit, so that their full intention may be ascertained *to a reasonable degree of certainty*" (emphasis added). Once it is determined that the parties intended to form a binding agreement, certainty of terms is important only as a "basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33. *See also Linnet v. Hitchcock*, 324 Pa.Super. 209, 471 A.2d 537, 540 (1984).

■ We conclude that the terms of the alleged contract are sufficiently specific to meet this standard. Browne testified that, when asked by Rose to state what he wanted, he gave a salary range between $75,000 and $125,000 and mentioned several specific fringe benefits. This evidence is adequate to allow a jury to determine that the contract would have been breached by payment below $75,000 or by failure to provide Browne with those benefits. The fact that the exact salary amount (if the amount was to be above $75,000) and other fringe benefits were not pinned down is not sufficient to defeat a finding that a contract was made absent any evidence that the missing terms were material to the parties.

■ For similar reasons, we do not accept defendants' view that the understanding between Maxfield and Browne that the deal would be "finalized" only after the March 31 meeting with Fraiberg requires a conclusion that Browne knew there were to be "further manifestations of assent" before the contract was finally concluded. *See* Restatement (Second) of Contracts § 26; *Cohen v. Johnson*, 91 F.Supp. 231, 235–36 (M.D.Pa.1950); *Upsal St. Realty Co. v. Rubin*, 326 Pa. 327, 192 A. 481, 482 (1937). A factfinder might reasonably infer that Westinghouse's assent to the core terms of the deal was already "final," and that only the (non-material) fine points remained to be "finalized."

Before we may conclude that there is a genuine issue of fact as to the existence of an oral contract between Browne and Westinghouse, however, we must address the question whether Maxfield had the authority to bind Westinghouse to the contract. "The fact of agency and the scope of the power of an agent are questions for the court, where the authority is created by an instrument in writing; but where such authority is to be implied from the conduct of the parties, or where the agency is to be established by witnesses, the fact and scope of the agency are for the jury." *Waldron v. Aetna Casualty & Surety Co.*, 141 F.2d 230, 234 (3d Cir.1944), *quoting Singer Manufacturing Co. v. Christian*, 211 Pa. 534, 540, 60 A. 1087, 1088.

There are several theories under which a principal may be liable to a third party for the acts of its agent. Most of these theories require some manifestation *by the principal*, by words or conduct, to the agent or to the third party, of its intent to be bound.

■ In the case of *actual* authority, the agent has the power to bind his principal because the principal has manifested its intent to be bound *to the agent*. Restatement (Second) of Agency § 7. The scope of actual authority may be specified quite explicitly, but is more commonly defined by implication. *Id.* comment c. Thus, courts have distinguished between two kinds of actual authority: "(1) express authority, or that which is directly granted; (2) implied authority, to do all that is proper, usual and necessary *to the exercise of the authority actually granted.*" *Reifsnyder v. Dougherty*, 301 Pa. 328, 152 A. 98, 100 (1930) (emphasis added).

■ It is clear from the facts of the case before us that Maxfield did not have actual authority to hire a news director without the approval of Fraiberg. Westinghouse's Limits of Authority directive, of which Maxfield was aware, requires that "[a]ll hires of management personnel reporting directly to a Vice President/General Manager must be approved by the Television Station Group President." That description fits the post of news director.

■ In the case of *apparent* authority, the agent has the power to bind his principal because the principal has manifested its intent to be bound *to the third party.* Restatement (Second) of Agency § 8; *Reifsnyder, supra* ("where the principal holds one out as agent by words or conduct"). Such a manifestation "may be made directly to a third person, or may be made to the community, by signs, by advertising, by authorizing the agent to state that he is authorized, or by continuously employing the agent." Restatement (Second) of Agency § 8 comment b. "The test for determining whether an agent possesses apparent authority is whether 'a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise.'" *Universal Computer Systems, Inc. v. Medical Service Assoc.,* 628 F.2d 820, 823 (3d Cir.1980), quoting *Apex Financial Corp. v. Decker,* 245 Pa.Super. 439, 369 A.2d 483, 485–86 (1976). Further, apparent authority will not be found "if the third party had notice of the agent's lack of authority." *Id. See also* Restatement (Second) of Agency § 49 comment c (interpretation of apparent authority).

■ In the case of agency by *estoppel,* the principal is bound by the acts of its agent because the principal has a duty under the circumstances to correct a third party's misapprehension that an agent is acting on its behalf and the principal has failed to satisfy that duty. Restatement (Second) of Agency § 8B; *Reifsnyder, supra* ("where the principal, by his culpable negligence in failing to supervise the affairs of his agent, allows him to exercise powers not granted to him, and so justifies others in believing he possesses the requisite authority"). Apparent authority and agency by estoppel are closely related. *Turnway Corp. v. Soffer,* 461 Pa. 447, 336 A.2d 871, 876 (1975); *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407, 410 (1968). Both require an analysis of what the third party knew or could have known through the exercise of due diligence.

■ Although the question is a close one, we conclude that a jury might reasonably find that Maxfield had apparent authority to make a final hiring decision. Browne testified that, in his experience, station managers generally had the authority to hire all but major "talent" without approval from above. A jury might reasonably conclude that Westinghouse's secret (vis a vis outsiders) divergence from that pattern placed upon it the duty to guard against misunderstandings.[5]

We conclude that there is a genuine issue of fact as to whether Maxfield had apparent authority to make a final hiring decision.[6] As a result, we conclude that a jury

---

**5.** There is evidence that Browne in fact knew that Maxfield did not have final authority to hire him. Several Westinghouse employees testified to that effect; that testimony is contradicted by Browne. There is also evidence that Browne had reason to suspect that Maxfield did not have authority. Browne testified that he knew that Maxfield would be meeting with Fraiberg to discuss the hiring decision and that he was not to talk to anyone about it until Maxfield telephoned after his conversation with Fraiberg. We agree that this testimony might be interpreted as going to prove that Browne knew that Fraiberg could influence the decision. Under that interpretation, "[w]hile it may be true that plaintiff subjectively believed that it was not possible for [the principal] to turn him down, he is, nevertheless, charged with the knowledge that [the agent] did not possess final hiring authority." *Jacobson v. Leonard,* 406 F.Supp. 515, 519 (E.D.Pa.1976). But a jury might also reasonably infer that the request that Browne remain silent was made solely to protect West-

inghouse against unofficial leaks in advance of a formal announcement by corporate headquarters.

**6.** In light of this conclusion, we need not address the question whether a jury might reasonably conclude that, even absent apparent authority, Maxfield's conduct was sufficient to bind Westinghouse. *"Inherent agency power* is a term used ... to indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." Restatement (Second) of Agency § 8A (emphasis added). *See also* Restatement (Second) of Agency § 161 (unauthorized acts of general agent). This theory of liability has been applied "when an agent has acted improperly in entering into contracts." *Id.* comment a. The policy underlying inherent agency power is that "[i]t would be unfair for an enterprise to have the benefit of the work of its agents without

might reasonably find that there was an oral contract between Westinghouse and Browne.

We now address defendants' alternative argument, that the contract was terminable at will and was therefore not breached by defendants' actions.

Under Pennsylvania law, "[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 176 (1974); *see also Geib v. Alan Wood Steel Co.*, 419 F.Supp. 1205, 1208 (E.D.Pa.1976).[7] We must ask whether Browne "has overcome the at-will presumption by presenting evidence which, when viewed in the light most favorable to him ..., shows that he and [the employer] contracted for something other than at-will employment, *and* that he is entitled to relief based on such a contract." *Darlington v. General Electric*, 360 Pa.Super. 183, 504 A.2d 306, 310 (1986). *See also Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637, 646 (1985) ("the burden is on the plaintiff ... to overcome the presumption"). The evidentiary standards for defeating the at-will presumption are quite high. "Courts require definiteness in employment contracting in order to overcome the at-will presumption." *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830, 834 (1986). "While an employment contract which is clearly for a term of a specific number of years would be enforceable, any language short of this definiteness is generally strictly reviewed." *Id.* at 837. The court in *Darlington, supra,* for example, held inadequate evidence that the employee quit his former job, that the employee was hired to fill a professional position,

and that the project for which the employee was hired was long-range. *But see Caldwell v. American Component, Inc.*, Civ. No. 81–0361 (E.D.Pa.1982) (reaching different result).

We hold that the evidence in this case is inadequate to permit a jury to conclude that the alleged contract in the case before us was not terminable at will. Although Browne has argued that job security was of the utmost importance to him, there is no evidence on the record that he communicated this concern to defendants. In a request for admission, Browne stated that he understood that he would have the KYW job until he gave KYW cause to terminate the relationship, that he expected that it would take approximately one and one- half years for the station to show a change in ratings, and that he assumed that he would have the job for at least two and one-half years. But in his deposition testimony, Browne testified that he had not negotiated for a specific term of employment or for employment terminable only for cause. We conclude that the evidence is insufficient to overcome the strong presumption under Pennsylvania law that employment contracts are terminable at will.

Defendants conclude that because the promised employment was terminable at will, their actions did not constitute a breach of the contract. Courts have been unsympathetic to claims based on anticipatory breach of a terminable-at-will employment contract. *See, e.g., Ingram v. Fred Oakley Chrysler-Dodge*, 663 S.W.2d 561, 562 (Tex.App.1983). To hold that a terminable at will contract is breached when the employer decides to end the employment relationship before the new employee begins work would be, in effect, to imply as a term of the contract that the employee

making it responsible to some extent for their excesses and failures to act carefully." *Id.* As this theory would, if broadly applied, substitute the general principle of *respondeat superior* for the more carefully drawn rules of agency law, we hesitate to rule on its applicability on the record before us.

**7.** The court in *Geary* left open the possibility of a cause of action for wrongful discharge in instances where a "clear mandate of public poli-

cy" is violated by the discharging employer, *Geary*, 319 A.2d 174 at 180; *Wells v. Thomas*, 569 F.Supp. 426, 432 (E.D.Pa.1983). Browne, however, has made no argument that he suffered a discharge in violation of public policy. Nor has he argued that this court should abrogate the employment at will doctrine. *See Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637, 645 (1985).

cannot be terminated until he is given an opportunity to perform. Such a term would be purely formal: an employer could eliminate his liability by letting the employee come to work and then firing him, for no reason, after five minutes on the job. The protection such an implied term would offer would be meaningful only if still other terms were implied: for example, that the employee be given a reasonable opportunity to prove that he can do the job. Other courts "have in effect abrogated the rule by implying into all employment contracts a term imposing on the employer the duty to dismiss an employee only in good faith and for just cause." *Banas, supra,* 502 A.2d at 645. But we doubt, in the face of the strength of the employment at will doctrine in Pennsylvania, that the courts of that state would embrace a cause of action that was predicated on such implied terms.

▪ In this case, however, there is evidence from which a jury could reasonably conclude that defendants did breach the alleged contract. Browne testified that he and Rose discussed his understanding that Westinghouse would be "fair and honest and straight" with him if "things go south," a statement a jury might reasonably understand to be a reference to severance pay.[8] A jury might thus reasonably find that the contract, albeit terminable at will, was breached by defendants' failure to provide Browne with the severance pay he had bargained for. We therefore hold that there is a genuine issue of material fact as to Browne's breach of contract claim, and that summary judgment on that claim must be denied.

### III.

Count I of the First Amended Complaint is captioned "Misrepresentation" and

claims that defendants' actions "were negligent, reckless, grossly negligent, grossly careless, grossly reckless, wanton, and without any regard to Art Browne's future or well being." Browne's tort and contract counts must, in our view, be understood as alternative theories of recovery. Defendants are correct, to a degree, that Pennsylvania law has sought to keep the lines between tort and contract clear. Pennsylvania courts, state and federal, have consistently rejected tort remedies for conduct that is remediable as a breach of contract. *See Glazer v. Chandler,* 414 Pa. 304, 200 A.2d 416, 418 (1964); *Standard Pipeline Coating Co., Inc. v. Solomon & Teslovich, Inc.,* 496 A.2d 840, 843–44 (Pa.Super.1985); *Stout v. Peugeot Motors of America,* Civ. No. 84–677 (E.D.Pa. Feb. 26, 1986) [Available on WESTLAW, DCT database]; *Iron Mountain Security Storage Corp. v. American Specialty Foods,* 457 F.Supp. 1158, 1165–66 (E.D.Pa.1978).[9] Leaving abstract principles aside, the same result is clearly necessitated by the facts of this case. If a contract was in fact formed, Maxfield's statements leading Browne to believe that a contract was formed cannot have been misrepresentations.

▪ Defendants, however, seek to take this line of argument further. They argue that Browne may not prevail on his tort claims even if no contract was in fact formed. We do not agree that cases concerned to limit "new tort theories that would undermine traditional contract rules," *Iron Mountain, supra,* 457 F.Supp. at 1166, should be read to create bright line rules where none have traditionally existed.[10] We thus reject the view that a cause

---

**8.** This interpretation was arrived at by defense counsel at Browne's deposition. Rephrasing his answer, counsel stated, "And your discussion had been essentially that you would want some kind of severance payment should your tenure as News Director be cut shorter than you would have liked?" Deposition of Arthur Browne at 352.

**9.** The measure of damages for breach of contract may in some circumstances, of course, resemble tort remedies. *See* Fuller & Perdue,

*The Reliance Interest in Contract Damages* (pts. 1 & 2), 46 Yale L.J. 52, 373 (1936–37).

**10.** An example of defendants' tendency to overstate the clarity of the lines between tort and contract is their assertion that promissory estoppel is available as a cause of action only where the promise at issue is gratuitous. Promissory estoppel is in fact frequently invoked in the context of bargaining transactions, *see* Farber & Matheson, *Beyond Promissory Estoppel,* 52 U.Chi.L.Rev. 903, 907 (1985); Henderson, *Promissory Estoppel and Traditional Contract Doc-*

of action for misrepresentation is unavailable on these grounds as a matter of law.

■ We therefore turn to the elements of the tort of misrepresentation. Misrepresentation may be either fraudulent or negligent. Negligent misrepresentation has been defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552; *see also Rempel v. Nationwide Life Insurance Co.*, 471 Pa. 404, 370 A.2d 366 (1977) (adopting this definition). False information may be communicated either directly or indirectly, by nondisclosure of material facts. *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1252 (Pa.Super. 1983).

To prove *fraudulent* misrepresentation, a plaintiff must prove "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient on the misrepresentation and (5) damage to the recipient as the proximate result." *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 454 (1971). "Fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false." *Delahanty, supra*, 464 A.2d at 1252. In addition, "it is evident that under Pennsylvania law fraud must be proved by a higher standard than the preponderance of the evidence standard." *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3d Cir.1981). *See Maley v. John Hancock Mutual Life Insurance Co.*,

609 F.Supp. 621, 625 (E.D.Pa.1985) (applying clear and convincing evidence standard).

■ In sum, the elements that negligent and fraudulent misrepresentation have in common are false information, justifiable reliance, causation, and pecuniary loss. The distinguishing elements are the state of mind of the person who supplied the information and the standard of proof that must be met by the plaintiff. We will examine the common elements first, and then turn to issues of state of mind and burden of proof.

■ *False information.* Browne has argued that the misrepresentation in this case was made by Maxfield when he assented to Browne's request for permission to tell Pearce, news director at DVM in Washington, that he would be taking a job at KYW in Philadelphia. Maxfield's statement, "OK, do it," would not generally be actionable on a misrepresentation theory if it were merely a prediction that Browne would get the job, or if Maxfield's statement expressed present intentions, either his own or those of his superiors at Westinghouse. Prosser & Keeton on Torts, § 109 at 762–63. But the statement would be actionable if Maxfield "purport[ed] to have special knowledge of facts which would justify the expectations he [was] raising," *id.* at 762, or if Maxfield's statement was a statement of present fact, *id.*

We hold that Maxfield's statement may properly be characterized as a misrepresentation under several different theories of the meaning of that statement. Browne's original theory of the events of this case was that it was Fraiberg's decision that deprived him of the KYW job. Under that theory, Maxfield's statement could be taken to be (1) a statement of present fact that Maxfield had, and had just exercised, full authority to offer Browne the job, or (2) a prediction, based on special knowledge, that Fraiberg would not exercise his veto. Alternatively, the evidence presented by

trine, 78 Yale L.J. 343, 352 (1969), and has been used in Pennsylvania cases in the context of employment agreements, *see, e.g., Del Conte v.*

*Stefonick*, 268 Pa.Super. 572, 408 A.2d 1151, 1152 (1979).

defendants suggests that it was Maxfield *himself* who undermined Browne's candidacy by withdrawing his endorsement of Browne. Under that theory, Maxfield's statement could be taken to be a statement of present fact that Maxfield had made his final choice and that Browne had his endorsement. Under either theory, a jury might reasonably find that Maxfield's act of assenting to Browne's telephone call to Pearce constituted a misrepresentation of the status of Browne's candidacy for the position of news director at KYW.

*Justifiable reliance.* Defendants have argued strenuously that it is unreasonable as a matter of law to quit a job (or, presumably, to undertake any other action leading to pecuniary loss) in reliance on a promise or a representation regarding terminable at will employment. Leaving aside assurances related to terms that are legally enforceable (promises of severance pay, for example), defendants' position has a certain logical force. In essence, they argue that to permit a tort remedy under such circumstances would place the plaintiff in a better position (some legal remedy) than he would have occupied had he gotten the illusory benefit of his bargain (no legal remedy). We are, however, not persuaded that this seeming anomaly requires the conclusion, urged upon us by defendants, that parties who negotiate terminable at will employment contracts are unprotected by prohibitions against tortious conduct in business dealings, doctrines traditionally used "to protect the reasonable expectations of the party who relies on another's course of conduct to the former's detriment in order to insure fundamentally fair dealing." *Straup v. Times Herald*, 283 Pa.Super. 58, 423 A.2d 713, 720 (1980) (discussing eq-

uitable estoppel). To reject this conclusion is not, as defendants argue, to permit an end run around the terminable at will doctrine. It is merely to hold that a party negotiating a terminable at will employment contract has a right to assess the risks inherent in such employment free of the distortions of tortious conduct.[11]

█ On the record before us, we conclude that a jury might reasonably find that, by calling Pearce, Browne justifiably relied on Maxfield's alleged misrepresentation of the status of his job candidacy.[12]

*Causation.* The next issue we must address is whether a jury might reasonably conclude on the basis of the present record that Browne's reliance on Maxfield's misrepresentation—his call to Pearce—caused Browne to lose his job at DVM in Washington.

The parties agree that Pearce showed no signs of annoyance at the news that Browne was to resign to take the KYW position, and that Pearce permitted Browne to resume his duties at DVM when the KYW job fell through. The parties also agree that Browne got into an argument with a co-worker, Jim Vautrot ("Vautrot"), about whether the station should send one of its staff cars to a reporting assignment in Philadelphia. Vautrot arranged to send a staff car; Browne thought that the staff car might be vandalized in Philadelphia, and that the station's equipment would be safer in an unmarked rental car. Browne called Pearce at home to bring the issue to his attention.

There is some disagreement as to what happened next. Browne's version, based on his own testimony, is as follows: Pearce told Browne not to change the arrange-

---

11. We note that upon questioning at oral argument, defense counsel modified her position somewhat by agreeing that a plaintiff might have a cause of action for fraud committed during the negotiation of a terminable at will employment contract. We fail to see, however, why the outcome should be any different in the case of allegations of negligent misrepresentation: both forms of misrepresentation require a showing of justifiable reliance.

12. Evidence that Carlton Sherwood, an acquaintance of Browne's, warned Browne that it would

be dangerous for Browne to give Pearce advance warning of his intent to leave DVM does not, in our view, go to the justifiability of Browne's reliance on Maxfield's misrepresentation. A contrary result would, in effect, make contributory negligence a defense to allegations of intentional tort. *See generally* Prosser & Keeton on Torts, § 108 at 750–51. The evidence would, however, be relevant to a defense of contributory negligence against a claim of *negligent* misrepresentation.

ments until Pearce talked to Vautrot and called Browne back. Browne responded, "Okay, Dave, but understand we're not sending a staffed crew car to Washington to protect someone's ego." Pearce did not call back. Browne changed the arrangements. The next day, Pearce asked Browne why Browne changed the car arrangements and accused Browne of insubordination for not following Pearce's order. Browne asked Pearce why he had not called Browne back; Pearce told Browne that he never intended to call. Browne defended his conduct, talking about Nuremberg and stating that it is not insubordination to refuse "to stand by and see the station shoot itself in the foot." Pearce told Browne to go home; later that evening, Browne learned that a memo had been posted saying that Browne had left the station.

Defendants' position is that Browne was fired for insubordination. Browne's position is that Pearce set him up, and that he was fired for disloyalty as a result of having accepted another job. On his unemployment compensation form, Browne stated that he had been fired for insubordination; Browne testified that he listed the reason Pearce seemed to have relied upon because he did not want to be "cute" on his application.

Browne's evidence on causation consists of (1) his own testimony that Pearce told him he would call back but later disclosed

that he never intended to do so; (2) evidence that Pearce was generally lenient in the face of insubordinate conduct by DVM employees; and (3) evidence that Pearce generally reacted harshly to employees who sought employment at other stations. The latter two types of evidence are drawn from the findings of fact from a hearing on Browne's unemployment compensation appeal and from the affidavits of Robert Hoyt ("Hoyt") and Carlton Sherwood ("Sherwood"), both of whom testified before the appeals examiner.

Defendants have raised serious doubts about the admissibility of much of Browne's causation evidence.[13] We agree with defendants that the evidentiary material put forth in the affidavit of Robert Hoyt is inadmissible. Hoyt, an acquaintance of Browne's, a former news director at WABC in New York, and now a professor of broadcast journalism at Emerson College, stated in his affidavit that *he* would not have fired Browne for insubordination, and that, based on Sherwood's testimony at the unemployment hearing, he was of the opinion that Browne was fired for disloyalty. As we are not satisfied on the basis of the affidavit that Hoyt is qualified as an expert in the field of television news personnel management, *see* Fed.R. Civ.P. 56(e), Fed.R.Evidence 702, we regard this testimony as inadmissible lay opinion evidence. *See* Fed.R.Evidence 701.

---

**13.** We consider these doubts to be timely. The Supreme Court suggested in *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), that it does not intend to require "that the nonmoving party must produce evidence *in a form that would be admissible at trial* in order to avoid summary judgment." *Id.* 106 S.Ct. at 2533 (emphasis added). The Court stated that the relevant inquiry is whether the nonmoving party's showing, "*if reduced to admissible evidence,* would be sufficient to carry respondent's burden of proof at trial." *Id.* at 2555 (emphasis added). In our view, the Court did not by this language intend to permit parties to defer compliance with the Federal Rules of Evidence until the trial stage. Such a position would eliminate the utility of summary judgment as a device for screening out cases that present no triable issues of fact. Rather, we read this language as simply emphasizing that all of the sources of evidence listed in Fed.R. Civ.P. 56(c), including affidavits, may be used to

resist a motion for summary judgment. *Celotex,* 106 S.Ct. at 2554. Fed.R.Civ.P. 56(e), which by its own terms regulates the content of such affidavits, requires that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts *as would be admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated therein" (emphasis added). *See* 6 Moore's Federal Practice para. 56.22[1] at 56–1321–22 ("the policy of Rule 56(e) is to allow the affidavit to contain all evidentiary matter, which, *if the affiant were in court and testifying on the witness stand,* would be admissible as part of his testimony" (emphasis added)). As Browne has not set forth by affidavit that he is currently unable to present all the evidence he intends to put forward, Fed.R.Civ.P. 56(f), we must evaluate his response to defendants' motion for summary judgment on the assumption that he has put forward his best evidence.

■ We also agree with defendants that the affidavit of Carlton Sherwood yields little admissible evidence. In his affidavit, Sherwood, a former DVM employee and an acquaintance of Browne's, testified that Pearce had confided in him in 1983 about the management of the station, including Pearce's treatment of several employees who wanted to leave the station. "[I]t became clear that he was not only obsessed with the subject [of loyalty], but considered such routine matters as resigning from the station for a better position, an unexcusable act of disloyalty." Affidavit para. 11. Most of the statements by Pearce that Sherwood recounts are hearsay, and do not come within any hearsay exception. Sherwood's account of his own experience—that Pearce "went so far as to tell other reporters I had actually been fired" when Sherwood resigned from the station, Affidavit para. 12—is inadmissible as "evidence of other ... acts" offered "to prove the character of a person in order to show that he acted in conformity therewith." Fed.R.Evidence 404.[14]

■ However, Sherwood also recounted several incidents of conduct by DVM employees, two of which involved Sherwood himself, which "in any other profession, would automatically result in dismissal but didn't even warrant a reprimand at the station." Affidavit para. 15. Federal Rule of Evidence 404 does not bar the use of evidence of past acts to prove that a person acted *inconsistently* with his past practice. To the extent Sherwood personally observed or experienced these incidents, his testimony as to Pearce's reactions to the bad conduct of other employees is admissible.

Finally, we agree with defendants that the findings of fact of the appeals examiner in Browne's unemployment compensation case are not admissible. Federal Rule of Evidence 803(8) provides that

> reports ... of public offices or agencies, setting forth ... (C) in civil actions ..., factual findings resulting from an inves-

tigation made pursuant to authority granted by law

are not excluded by the hearsay rule "unless the sources of information or other circumstances indicate lack of trustworthiness." The rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." Advisory Committee note. *See generally Zenith Radio Corp. v. Matsushita Electronic Industries Co.,* 505 F.Supp. 1125, 1146–48 (E.D.Pa.1980).

■ In this case, circumstances strongly suggest lack of trustworthiness. Pearce has testified that he was surprised to learn that employees fired for insubordination were thereby denied unemployment compensation, and that he decided not to contest Browne's appeal. Sherwood's affidavit confirms that the three DVM representatives who participated in the hearing declined to cross-examine Sherwood. This suggests that the unemployment compensation hearing was not a truly adversary proceeding. It further appears from the factual findings and from affidavit testimony that the appeals examiner relied heavily on evidence we have deemed inadmissible. Failure to adopt the Federal Rules of Evidence does not, of course, render administrative proceedings untrustworthy. In light of the nonadversarial nature of the proceeding, however, we conclude that admission of the appeal examiner's findings of facts would simply permit Browne to admit the evidence we have held must be excluded through the back door.

■ In sum, Browne's causation evidence must be limited to Sherwood's testimony as to Pearce's past reactions to bad conduct by other DVM employees and Browne's testimony as to Pearce's conduct during their own dispute. Although Browne's case is substantially weakened by the exclusion of some of his causation evidence, we nonetheless conclude that a jury could reasonably find on the basis of this evidence that Pearce would have reacted more leniently to Browne's insubordinate conduct had he not known that Browne had

---

**14.** This evidence does not demonstrate sufficient regularity of conduct to rise to the level of admissible "habit" evidence under Fed.R.Evidence 406.

intended to quit, and that Browne's action in reliance on Maxfield's statement was a substantial factor in his loss of employment. That is all Browne must prove to sustain his burden on the question of causation. *Hamil v. Bashline*, 481 Pa. 88, 392 A.2d 1280, 1285 (1978).

■ *Pecuniary loss.* Under Pennsylvania law, "the victim [of misrepresentation] is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations," *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983), and pecuniary loss is an element of the cause of action, *see supra.* In addition to other reliance damages, "in an employment context lost future income [from his prior job] is in fact what the plaintiff loses when he is induced to leave an otherwise on-going position." *Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405, 410 (1985). We conclude that the pecuniary loss required to sustain a misrepresentation claim is to be defined in the same manner when the plaintiff is caused to be *fired* from an otherwise ongoing position.

■ We agree with defendants that the record requires the conclusion that Browne's employment at DVM was terminable at will. The task of determining damages will thus be a difficult one. But that obstacle is not insuperable. *Cf. Delahanty, supra*, 464 A.2d at 1257–58 (discussing level of certainty required for proving damages). We thus conclude that a jury might reasonably find that Browne suffered pecuniary loss as a result of the alleged misrepresentation.

■ *State of mind.* Turning now to the elements that distinguish negligent misrepresentation from fraudulent misrepresentation, we find that a jury might reasonably conclude from the evidence that Maxfield acted without exercising reasonable care in misrepresenting the status of Browne's job candidacy. We also find that a jury might conclude, by a preponderance of the evidence, that Maxfield acted with conscious indifference to whether his representations were true or false.

■ *Standard of proof.* In order to prevail on a claim of *fraudulent* misrepresentation, "fraud must be proved by a higher standard than the preponderance of the evidence standard." *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3d Cir.1981). *See also Maley v. John Hancock Mutual Life Insurance Co.*, 609 F.Supp. 621, 625 (E.D.Pa.1985) (applying clear and convincing evidence standard to *all* elements of fraudulent misrepresentation). Our summary judgment determination must, under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), be made in light of the evidentiary standard to be applied at trial. We find that Browne cannot meet the heightened standard of proof required for proving fraud on the basis of the record before us.

### IV.

■ Our conclusion that Browne's fraudulent misrepresentation claim cannot stand does not require a finding that punitive damages are unavailable as a matter of law. The wrongful conduct underlying a claim for punitive damages, unlike allegations of fraud, need be proven only be a preponderance of the evidence. *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1098 & n. 14 (1985). Nonetheless, we agree with defendants that punitive damages are inappropriate on the record before us.

■ The Pennsylvania Supreme Court stressed in *Martin* that "the imposition of punitive damages is an extreme remedy." *Id.* at 1098 n. 14. Focusing on the state of mind required to be shown, that court was careful to limit punitive damages to cases in which the actor appreciates that his conduct creates a high degree of risk. *Id.* 494 A.2d at 1097. Varying the factual situation in the case before us, such a showing might be made if Browne had told Maxfield that he had reason to fear Pearce's reaction. Instead, however, the evidence shows that Browne merely expressed his view that it would be improper for Pearce to hear the news of his KYW job from anyone

but Browne. On these facts, we hold that a jury could not reasonably find that Maxfield was aware of the nature of the risks Browne faced and nonetheless acted with a reckless indifference to Browne's interests. *Id.* 494 A.2d at 1098 & n. 13. We thus hold that punitive damages are unavailable in this case.

## V.

 We also agree with defendants that the claim of Kathleen Browne, Arthur Browne's wife, for damages for loss of consortium is not viable on the facts of this case. Browne has not claimed damages for physical and emotional injuries, and such damages are likely to be unavailable to him as a matter of law. *See Kutner v. Eastern Airlines, Inc.,* 514 F.Supp. 553, 559 (E.D. Pa.1981) (limit on damages for breach of contract); Restatement (Second) of Torts § 552B (limit on damages for negligent misrepresentation). Damages for loss of consortium are not generally available when the spouse's direct injuries are pecuniary, *see, e.g., Cappiello v. Ragen Precision Industries, Inc.,* 192 N.J.Super. 523, 471 A.2d 432 (1984), and we do not predict that Pennsylvania courts would expand the cause of action beyond these limits.

In sum, we shall grant defendants' motion for summary judgment as to plaintiffs' claim of fraudulent misrepresentation, loss of consortium, and punitive damages, and deny their motion as to plaintiffs' claims of negligent misrepresentation and breach of contract.

## VI.

As a final matter, defendants have moved to strike various portions of the evidence produced by plaintiffs in opposition to defendants' motion for summary judgment. As we have not relied upon any of the evidence objected to by defendants, we shall deny defendants' motion without prejudice to the raising of evidentiary objections at trial.

An appropriate order is appended.

## ORDER

For the reasons set forth in the accompanying memorandum, it is hereby ORDERED AND DIRECTED that

(1) defendants' motion for summary judgment is GRANTED as to plaintiffs' claims of fraudulent misrepresentation, loss of consortium, and punitive damages, and DENIED as to plaintiffs' claims of negligent misrepresentation and breach of contract;

(2) defendants' motion to strike portions of plaintiffs' exhibits is DENIED WITHOUT PREJUDICE to the raising of evidentiary objections at trial.