**McNEIL REAL ESTATE FUND XXVI, L.P., Plaintiff,**

v.

**MATTHEW'S, INC. OF DELAWARE, Defendant.**

**No. Civ.A. 99–1426.**

United States District Court, W.D. Pennsylvania.

June 8, 2000.

**438**

Jeffery A. Deller, Klett Rooney Lieber & Schorling, P.C., Pittsburgh, PA, for Plaintiff.

Michael Lastowski, Duane Morris & Hecksher, LLP, Wilmington, DE, for Defendant.

## ORDER

STANDISH, District Judge.

AND NOW, this 8th day of June, 2000, after the plaintiff, McNeil Real Estate Fund XXVI, L.P., filed an action in the above-captioned case, and after a motion for summary judgment was submitted by plaintiff, and after a Report and Recommendation was filed by the United States Magistrate Judge granting the parties ten days after being served with a copy to file written objections thereto, and upon consideration of the objections filed by defendant, Matthew's, Inc. of Delaware, and the response to those objections filed by plaintiff, and upon independent review of the motion and the record and upon consideration of the Magistrate Judge's Report and Recommendation, which is adopted as the opinion of this Court.

IT IS ORDERED that plaintiff's motion for summary judgment (Docket No. 7) is granted and judgment is entered in favor of plaintiff.

IT IS FURTHER ORDERED that within fifteen (15) days of the date of this Order the parties submit a stipulation in conformity with the Magistrate Judge's Report and Recommendation as to the total dollar amount owed under the Lease and Guaranty Agreement through June 30, 2000, including any interest due on the $519,799.45 uncontested damages and the present value of the base rent payments due under the Lease Agreement for the period between March of 2002 and February of 2005.

## REPORT AND RECOMMENDATION

MITCHELL, United States Magistrate Judge.

### I. Recommendation

It is respectfully recommended that plaintiff's motion for summary judgment (Docket No. 7) be granted and that judgment be entered in favor of plaintiff. It is further recommended that the parties be directed to submit a stipulation in con-

formity with this Report and Recommendation as to the total dollar amount owed under the Lease and Guaranty Agreements through June 30, 2000, including any interest due on the $519,799.45 uncontested damages and the present value of the base rent payments due under the Lease Agreement for the period between March of 2002 and February of 2005.

## II. *Report*

Presently before this Court for disposition is a motion for summary judgment brought by the plaintiff, McNeil Real Estate Fund XXVI, L.P. ("McNeil").

Plaintiff commenced this action on August 30, 1999, bringing a single claim for Breach of Guaranty Surety against defendant Matthew's, Inc. of Delaware ("Matthews").

The record demonstrates that in 1993, McNeil acquired a retail mall in Pittsburgh, Pennsylvania known as the Northway Mall.[1] In an effort to "reposition" the Northway Mall as a "power center," McNeil approached Reading China about leasing space.[2] Jay Brinsfield, the manager and controlling shareholder of Reading China, expressed interest in the proposal and subsequently entered into negotiations with Dean Lontos, the Vice President of Commercial Leasing at McNeil.[3] Once the commitment was made to lease space at the Northway Mall, Mr. Brinsfield delegated the lease negotiations to Joe Bizzarro, Reading China's Chief Financial Officer.[4] During negotiations it became apparent that Reading China's "financial statements were not particularly strong" and McNeil consequently sought additional security. Specifically, McNeil requested that Mat-

thews, Reading China's sister company which was also owned by Jay Brinsfield and managed by Messrs. Bizzarro and Brinsfield, act as a guarantor for Reading China.[5] A security agreement ("the Guaranty Agreement") was eventually entered into providing that:

> If the Lease is terminated or rejected in any such [bankruptcy] proceeding ... then as between Landlord and Guarantors, Landlord shall have the right to accelerate all of Tenant's obligations under the Lease and Guarantors' obligations under this Guaranty. In such event, all such obligations shall become immediately due and payable by Guarantors to Landlord without any notice or demand whatsoever.[6]

The Guaranty Agreement, which was signed by Mr. Bizzarro, was expressly incorporated into the agreement subsequently entered into by Mr. Brinsfield and Mr. Lontos on May 5, 1994, under which Reading China was to lease space from McNeil at the Northway Mall ("Lease Agreement").[7]

The Lease Agreement provided that the term of the lease was for ten years commencing on March 1, 1995, and ending on February 28, 2005; that Reading China was to pay a base rent in the amount of $17,509.50 a month or $210,114.00 annually for the first seven years of the lease; that for the remaining three years the monthly rent would be $18,482.25 or $221,787.00 annually; that in addition to the base rent Reading China was responsible for "additional rent" in the amount of $5,836.80 per month, for operating expenses or common

---

1. Complaint ¶ 1; Lontos Depo., pp. 7–8. A copy of the transcript of the deposition of Dean Lontos has been submitted by plaintiff as Exhibit C to the Declaration of Jeffrey A. Deller, Esq. (Docket No. 10).

2. Lontos Depo., pp. 7–8.

3. Lontos Depo., pp. 6, 8–10.

4. Lontos Depo., pp. 9–10.

5. Lontos Depo., pp. 16–17.

6. Guaranty Agreement ¶ 20. A copy of the Guaranty Agreement appears as Exhibit G to the Lease Agreement and has been submitted by plaintiff as Exhibit A to the Declaration of Samuel Rossi (Docket No. 9).

7. Lontos Depo., pp. 11, 15, 17.

area maintenance charges, and $1,673.13 for real estate taxes.[8]

Reading China took possession of the designated premises as provided in the lease on or about March 1, 1995, and conducted business there until January of 1999, when, having filed for bankruptcy in October of 1998, it was forced to close all of its stores.[9] Further, pursuant to 11 U.S.C. § 365, Reading China rejected the Lease Agreement and vacated the premises entirely on February 4, 1999.[10] Thereafter, on July 19, 1999, McNeil exercised its rights under the Guaranty Agreement and sought all payments due under the Lease Agreement from Matthews. Matthews has refused to pay taking the position that Mr. Bizzarro did not have the authority to bind Matthews under the Guaranty Agreement. McNeil filed the instant complaint on August 30, 1999.

In the interim, it appears that McNeil made efforts to find another tenant to replace Reading China which proved successful on October 11, 1999, when it entered into another lease agreement with the Milton D. Meyer Company d/b/a Family Toy Stores ("Family Stores Agreement").[11] McNeil nevertheless maintains that as a result of Reading China's breach of the Lease Agreement it has incurred the following losses:

| | | |
|---|---|---|
| a. | The amount of rent past due at the time Reading China filed for bankruptcy; | $37,969.31 |
| b. | Lost rent between February 1999 (the date the Lease Agreement was rejected by Reading China) and October 1999, when Milton D. Myer Co. became a new tenant; | $200,153.04 |
| c. | A five month free rent concession offered to induce Milton D. Myer Co. to enter into the Family Stores Agreement, including $87,547.5 in base rent and $38,310.50 in additional rent; | $125,858.00 |
| d. | The differential between the rent Reading China was to pay during the last three years of the lease and the rent Milton D. Myer Co. was obligated to pay under the Family Stores Agreement, which was $972.75 less; | $35,019.00 |
| e. | A construction allowance provided to Milton D. Myer Co. as consideration for entering into the Family Store Agreement; | $65,000.00 |
| f. | Miscellaneous fees incurred in connection with finding a new tenant including broker commissions; legal fees; and additional improvements to the leased premises. | $90,819.10 |
| | TOTAL | $554,818.45[12] |

In addition, plaintiff claims it is entitled to attorney's fees as well as interest from July 19, 1999 to the present or through the date of judgment.

Plaintiff has presently moved for summary judgment arguing that the evidence of record amply supports a finding that Matthews is bound under the terms of the Guaranty Agreement and that the absence of evidence to the contrary precludes a finding that a genuine issue exists for trial.

Summary judgment is appropriate where "there is no genuine issue as to any

---

**8.** *See* Lease Agreement, Exhibit A to Rossi Decl. (Docket No. 9).

**9.** Lontos Depo., pp. 12, 23–24.

**10.** Lontos Depo., pp. 23–24.

**11.** Lontos Depo., p. 24. A copy of the Family Stores Agreement has been submitted by plaintiff as Exhibit B to Samuel Rossi's declaration (Docket No. 9).

**12.** *See* Rossi Decl. ¶¶ 15–22 (Docket No. 9). *See also* Lontos Depo., pp. 25–28. We also note here that plaintiff has apparently made several typographical and/or mathematical errors in calculating its damages and, thus, the total reflected above differs from that set forth in plaintiff's brief. Plaintiff begins its summary therein by stating that the total damages amount to $554,563.54 and then concludes that the total is $554,563.45. Second, when the figures in plaintiff's chart are added up they actually total $554,545.45 and not $554,563.45. Finally, plaintiff has represented that to induce Milton D. Myer Co. to enter into the Family Store Agreement it was compelled to provide the company with five months free rent which included $87,547.50 of base rent and $38,310.50 in additional rent. Plaintiff then concludes that these two figures add up to $125,585.00, when in fact they total $125,858.00. When this figure is added to the other damages listed it appears that plaintiff's total damages are actually $554,818.45.

material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Marzano v. Computer Science Corp.*, 91 F.3d 497 (3d Cir. 1996). In deciding a motion for summary judgment the court must view all inferences in a light most favorable to the non-moving party. *Id.* at 501, citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994). The non-moving party, however, may not rely on bare assertions, conclusory allegations or mere suspicions to support its claim but must demonstrate by record evidence the meritorious nature of the claim. *Orsatti v. New Jersey State Police*, 71 F.3d 480 (3d Cir.1995).

■ Plaintiff initially argues that Matthews is bound by the Guaranty Agreement as Bizzarro was authorized to sign it on Matthews' behalf under the doctrine of apparent authority. "Although the question of whether a principal-agent relationship exists is normally one of fact for the jury, where the facts giving rise to the relationship are not in dispute, the question is one properly decided by the court." *Constitution Bank v. DiMarco*, 836 F.Supp. 304, 307 (E.D.Pa.1993), *affirmed*, 27 F.3d 556 (3d Cir.1994), citing *Joyner v. Harleysville Ins. Co.*, 393 Pa.Super. 386, 574 A.2d 664, 668 (1990).

Pennsylvania courts define apparent authority as that authority which, although not actually granted, the principal knowingly allows the agent to exercise or possess. *D & G Equipment v. First National Bank*, 764 F.2d 950, 954 (3d Cir.1985); *Browne v. Maxfield*, 663 F.Supp. 1193, 1199 (E.D.Pa.1987). In cases of apparent authority, the intent to be bound to a third party flows from the principal's conduct and not from that of the agent. *Id.* Additionally, without actual knowledge of the agent's authority to bind the principal, the third party must exercise only reasonable diligence to ascertain the agent's authority. *Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215, 1222 (1987).

*Id. See Turner Hydraulics, Inc. v. Susquehanna Construction*, 414 Pa.Super. 130, 135, 606 A.2d 532, 534 (1992) ("Apparent Authority exists where a principal, by word or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise.") Thus, McNeil's reliance on Bizzarro's apparent authority will be deemed appropriate only if such reliance is a reasonable interpretation of Brinsfield's and/or Matthews' manifestations. *Id.*

■ Here, the undisputed facts demonstrate that Joseph Bizzarro was the Chief Financial Officer of Matthews and Reading China and that he reported only to Brinsfield; [13] that as the Chief Operating Officer of Matthews, Bizzarro's responsibilities encompassed everything but sales and marketing, including overseeing the financial side of the business, informations systems, payroll, distribution and warehousing; [14] that it was also Bizzarro's responsibility to secure financing and negotiate the terms of loan agreements with prospective lenders; [15] that McNeil entered into lease negotiations with both Brinsfield and Bizzarro; [16] that preliminary negotiations took approximately one year; [17] that Brinsfield and Bizzarro ultimately entered into a letter of intent to lease the premises at

---

13. Bizzarro Depo., pp. 12, 15, 48–49; Brinsfield Depo., p. 15; Lontos Depo., p. 10. Copies of the transcripts of the depositions of Jay Brinsfield and Joseph Bizzarro have been submitted by plaintiff as Exhibits K and L, respectively, to the Supplemental Declaration of Jeffery Deller, Esq. (Docket No. 14).

14. Bizzarro Depo., p. 14; Brinsfield Depo., p. 49.

15. Bizzarro Depo., pp. 51–54; Brinsfield Depo., p. 49; Rossi Decl. ¶ 3; Lontos Depo., p. 23.

16. Bizzarro Depo., p. 29.

17. Rossi Decl. ¶ 4; Lontos Depo., p. 10.

Northway Mall;[18] that Brinsfield then delegated responsibility to Bizzarro to finalize the lease negotiations;[19] that subsequent review of Reading China's financial statements revealed its limited net worth;[20] that in order to close the deal McNeil requested that Matthews act as guarantor;[21] that Reading China had encountered difficulties in this regard before which were resolved by making Matthews a guarantor;[22] that the Guaranty Agreement which was signed by Bizzarro was expressly incorporated into the Lease Agreement;[23] that the Lease Agreement not only referenced the Guaranty Agreement but included the Guaranty Agreement as an exhibit;[24] that Brinsfield signed the Lease Agreement without objection and has never objected to the Guaranty Agreement being made part of the Lease Agreement since or given any indication that Bizzarro was unauthorized to enter into the Guaranty Agreement on behalf of Matthews.[25] Further, although Brinsfield now contends that Bizzarro lacked the authority to bind Matthews as a surety for Reading China, Bizzarro testified that he not only was given Brinsfield's authority but that he would have been fired had he entered into such an agreement without authorization and that it was his understanding that a board resolution was passed authorizing him to execute the agreement.[26] Moreover, the record demonstrates that Matthews was the guarantor for Reading China in several other lease agreements some of which were executed by Bizzarro.[27]

Under these circumstances, it appears that Brinsfield knowingly allowed Bizzarro to exercise authority on Matthews' behalf or, at the very least, lead McNeil to believe that Bizzarro had the authority to enter into the Guaranty Agreement. Bizzarro was a high level executive of both Matthews and Reading China who participated in all the preliminary lease negotiations with Brinsfield and signed the letter of intent. Moreover, once the commitment to lease space in the Northway Mall had been made, Brinsfield delegated all further responsibility of "closing the deal" to Bizzarro, as he had done in the past, permitting McNeil to reasonably believe that Bizzarro had authority to act on his behalf. Most important, however, is that Brinsfield subsequently signed the Lease Agreement which clearly referenced and incorporated the Guaranty Agreement which had been entered into by Bizzarro without objection. Because these facts are undisputed and, in our view, give rise to a principal-agent relationship, it appears that Bizzarro had the apparent authority to enter into the Guaranty Agreement on behalf of Matthews,.

Even if the Court were to find that Bizzarro lacked apparent authority to sign the Guaranty Agreement, however, it nevertheless appears that Matthews is bound by the Guaranty Agreement under the

18. Rossi Decl. ¶ 4.

19. Bizzarro Depo., pp. 30, 33; Lontos Depo., pp. 8–10.

20. Bizzarro Depo., pp. 34–35; Lontos Depo., pp. 16–19.

21. Bizzarro Depo., p. 36; Lontos Depo., pp. 15–20. Indeed, the preamble of the Guaranty Agreement specifically states that Matthews agreed to execute the guaranty in order to induce McNeil to enter into the lease with Reading China and that had it not agreed to act as guarantor for Reading China McNeil would not have entered into the lease. *See* Guaranty Agreement, p. 1.

22. Bizzarro Depo., pp. 34–35.

23. Bizzarro Depo., p. 37; Rossi Decl. ¶¶ 9–11; Lontos Depo., p. 19.

24. Rossi Decl. ¶ 9.

25. Bizzarro Depo., pp. 36–37; Rossi Decl. ¶¶ 12–14; Lontos Depo., 17, 22.

26. Bizzarro Depo., pp. 37–39, 59–60.

27. Bizzarro Depo., pp. 34–36, 39.

doctrine of agency by estoppel. *See* Restatement (Second) of Agency § 8B (1958).

■ Agency by estoppel has been recognized in Pennsylvania as having two elements: 1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and 2) there must be justifiable reliance by the third party. *Juarbe v. Philadelphia*, 288 Pa.Super. 330, 431 A.2d 1073, 1079 (1981), citing *Reifsnyder v. Dougherty*, 301 Pa. 328, 152 A. 98 (1930).

■ In the instant case, it is undisputed that the Lease Agreement executed by Brinsfield makes reference to and incorporates the Guaranty Agreement which was signed by Bizzarro. Brinsfield was therefore on notice that Bizzarro had entered into the security arrangement on behalf of Matthews and yet proceed to sign the Lease Agreement and enjoy the benefits of the contract without objection or without otherwise giving any indicating that Bizzarro did not have the authority to bind Matthews in a surety agreement. Under these circumstances it appears that Matthews is properly estopped from proffering such an argument now. *Id.*

Moreover, we find Matthews' counter argument that Brinsfield did not read the full text of the Lease Agreement and was unaware that the Guaranty Agreement was incorporated therein unpersuasive. Not only is the guaranty clearly identified in the table of contents to the Lease Agreement but it is twice mentioned in the first page of the Lease Agreement which summarizes the basic lease terms.[28] Moreover, "[a]uthority by estoppel occurs when a principal, by his culpable negligence, permits an agent to exercise powers not granted to him, even though the principal did not know or have notice of the agent's conduct." *Apex Financial Corp. v. Decker*, 245 Pa.Super. 439, 369 A.2d 483, 486 (1976). Rather, it is incumbent upon the principal to take reasonable steps to safeguard himself and third parties dealing with an agent from possible harm caused by the agent. *Id.* Accordingly, Brinsfield's alleged failure to notice that the Lease Agreement included a guaranty does not, by itself, relieve Matthews of liability.

This is particularly true here when it is undisputed that Matthews had entered into other surety agreements like the one presently at issue in the past and that some of those had been executed by Mr. Bizzarro.[29] Indeed, Bizzarro testified that it was well known in the industry that Matthews and Reading China were sister companies and that once Reading China's financial statements were presented to potential lessors it was common for them to ask for Matthews' guaranty.[30] It was also Bizzarro's testimony that the lease agreements would never have been entered into without the guarantees and that he knew of four to six other lease agreements that were guaranteed by Matthews, some of which he executed.[31] Further, it appears that the guarantees were disclosed as related party transactions in Matthews' financial statements.[32]

In light of these representations, none of which have been disputed by Matthews, the fact that Brinsfield signed the Lease Agreement without inquiry, in our view,

---

**28.** The first reference is a paragraph entitled "Guarantor" which is set out in bold lettering and underscored. In the second reference, under the heading "Entire Agreement" eleven potential exhibits are listed with an "x" next to Exhibit G which is identified as "Guaranty." *See* Exhibit A to Rossi Decl. (Docket No. 9).

**29.** Bizzarro Depo., pp. 34–36, 39. It also appears that Bizzarro had entered into a number of other agreements on behalf of Matthews including store management agreements, assignment of real estate leases, car leases, and financing statements to help fund Matthews' working capital needs. *See* Bizzarro Depo. pp. 42–45, 54–59 and accompanying Exhibits 3–9, 14–19.

**30.** Bizzarro Depo., pp. 34–35, 39.

**31.** *Id.*

**32.** Bizzarro Depo. p. 36.

evidences a failure to take reasonable steps to safeguard Matthews or McNeil from the possibility of harm if indeed Brinsfield did not want Matthews to act as a guarantor in this particular instance. It therefore appears that Brinsfield, and thus Matthews, is estopped from denying Bizzarro's authority to enter into the Guaranty Agreement at this juncture. *Juarbe v. Philadelphia, supra; Apex Financial Corp. v. Decker, supra. See SEI Corp. v, Norton & Co.,* 631 F.Supp. 497, 502 (E.D.Pa.1986) ("An affirmance of an unauthorized act can be inferred from the principal's silence ...."); *Rednor & Kline, Inc. v. Department of Highways,* 413 Pa. 119, 196 A.2d 355, 358 (1964) ("[A]fter an act of a corporate official who has or is in a position of apparent authority, has or should have become known, failure to promptly disavow or repudiate such action raises a presumption of actual authority or of affirmance or ratification.")

Finally at issue is the amount of damages to which McNeil is entitled. Matthews challenges McNeil's assessment of its damages on three bases. First, Matthews argues that because Reading China properly terminated the lease after the initial five year term as provided for in the Lease Agreement that McNeil is not entitled to any damages which it incurred beyond the five year period. Second, Matthews contends that to the extent that McNeil is seeking damages based on the payment of future rent, the Court should reduce any award to the present value. Finally, Matthews argues that McNeil is not entitled to interest on any future rent payments since no interest has yet accrued. Because McNeil has not addressed

the latter two issues in its brief and has only sought interest from "July 19, 1999 to the present" or "through the date of judgment," we presume that it has conceded that any future rent payments should be reduced to its present value and that it is not entitled to interest on those payments.[33] Accordingly, we will address only Matthews' first argument regarding termination of the lease.

The Addendum to the Lease Agreement which was executed on June 13, 1994, provides that:

> In the event during each and every one of the first five (5) particular Lease years, Tenant's Gross Sales (as defined in the Lease) are less than $175.00 per square foot of the Leased Premises, then Tenant shall have the right, effective on the last day of the 66th month of the Lease term, to terminate this Lease but only in such event and only if Tenant provides the Landlord with written notice during the 61st month of the Lease term of its intent to terminate the Lease. In the event that Tenant's Gross Sales equal or exceed $175.00 per square foot of the Leased Premises during any one of the first five (5) Lease Years or Tenant does not provide notice as required in the preceding sentence, then Tenant shall not have any right to terminate the Lease.[34]

Matthews contends that Reading China gave notice of its intent to terminate the Lease Agreement under this provision when it rejected the lease in bankruptcy and that by doing so terminated any further obligations it had under the Guaranty Agreement.[35] We disagree.

---

**33.** Specifically, Matthews challenges the $35,019.00 sought by McNeil which represents the variance in the base rent owed by Reading China under the Lease Agreement for the period between March 2002 and February of 2005 and the base rent owed by Milton D. Myer Co. for the same time period. Notably, Matthews does not suggest what the present value of these future rent payments would be nor does it appear to challenge the other damages sought by McNeil. As such, Matthews has seemingly conceded that

McNeil is owed $519,799.45 plus interest and the present value of the future rent.

**34.** *See* Addendum to Lease Agreement, Exhibit A to Rossi Decl. (Docket No. 9).

**35.** It is undisputed that Reading China's gross sales during the time it occupied the premises in the Northway Mall never met or exceeded $175.00 per square foot.

Under the Lease Agreement, the term of the lease began on March 1, 1995 and, thus, the "first five (5) particular Lease Years" which triggered Reading China's right to terminate would not have been completed until February 29, 2000. The 61st month of the lease term, therefore, would not have begun until March 1, 2000, and the last day of the 66th month of the lease term would have been August 31, 2000. Thus, under the termination clause cited above, Reading China's right to terminate was never triggered and nevertheless would not have become effective until August 31, 2000, even if Reading China had given written notice of its intent to terminate.

It is undisputed, however, that Reading China did not provide notice as required under the Lease Agreement but rather merely rejected it in bankruptcy effective February 4, 1999, which was less than four years into the lease term and well before it was eligible to give notice under the Agreement. Under these circumstances, it cannot be said that Reading China terminated the lease as provided in the Lease Agreement or that Matthews' obligations are somehow limited to the first five years of the lease term. To the contrary, the Guaranty Agreement gives McNeil the right to accelerate all of Reading China's obligations under the Lease Agreement and seek the entire amount of rent due for the ten year lease term from Matthews. Thus, it appears that Matthews is liable to McNeil for $519,799.45 plus interest as well as the loss in rent McNeil will suffer between March 2002 and February of 2005, reduced to its present value.

For these reasons, it is recommended that plaintiff's motion for summary judgment (Docket No. 7) be granted and that judgment be entered in favor of plaintiff. It is further recommended that the parties be directed to submit a stipulation in conformity with this Report and Recommendation as to the total dollar amount owed under the Lease and Guaranty Agreements through June 30, 2000, including any interest due on the $519,799.45 uncontested damages and the present value of the base rent payments due under the Lease Agreement for the period between March of 2002 and February of 2005.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.