**Martin W. BERDA and Linda Berda, Plaintiffs,**

v.

**CBS INC., Defendant.**

**Civ. A. No. 88–411.**

United States District Court, W.D. Pennsylvania.

Feb. 3, 1992.

Louis Tarasi, Joseph Hinchliffe, Pittsburgh, Pa., for plaintiffs.

Arthur Schwab, Pittsburgh, Pa., Helen M. Gold, CBS, Inc., New York City, for defendant.

## MEMORANDUM ORDER

### D. BROOKS SMITH, District Judge.

Before the Court at this time are defendant CBS, Inc.'s (CBS') motion for summary judgment, defendant's motion to bifurcate the liability and damages phases of the trial of this matter, and plaintiffs' motion to amend the complaint. The motion for summary judgment is granted; the motions to bifurcate and to amend are denied as moot.[1]

Plaintiff Martin W. Berda is thirty-eight years old, and is an experienced television operations engineer/technician. From February, 1980, to October, 1981, he was employed at WMAR–TV 2 in Baltimore, Maryland, and from July 7, 1982 to March 29, 1986, he was employed in engineering and technician jobs at WPXI–TV 11 in Pittsburgh, Pennsylvania. In the middle of 1985, Martin Berda became a shop steward for Local 5, International Brotherhood of Electrical Workers, the union local representing technical employees at WPXI. As a shop steward, he had superseniority and was therefore protected from lay-offs. Pretrial Stipulation, Stipulation of Uncontested Facts. ("Stipulation")

Since 1981, Martin Berda had desired to work for CBS, and had at various times written to CBS seeking employment in its engineering or operations sections. In July, 1985, he again wrote to CBS expressing interest in working for that network.[2]

In response to Berda's letter, Emil Franks, the Technical Manager, Studio/Field for CBS' Operations and Engineering Division, called Martin Berda in the fall of 1985 and arranged an interview for Martin Berda on February 27, 1986, in Washington, D.C. On February 27, 1986, Martin Berda interviewed with Franks and with M. Lynwood Heiges, Jr., Director of Administration for CBS in Washington, D.C. After negotiating with Franks and Heiges concerning the point in the salary scale at which Martin Berda would enter, Berda and CBS agreed that he would begin at one level below top wages for his classification under the collective bargaining agreement between CBS and the IBEW local in Washington, D.C. Martin Berda accepted the offer of employment with CBS on March 14, 1986, and began working in Washington, D.C. on April 14, 1986. His wife, plaintiff Linda Berda, who taught elementary school mathematics at a parochial school in Pittsburgh from January, 1984 to April, 1986, quit her job to be with her husband in Washington, D.C. Stipulation; Berda deposition, 105–07.

Martin Berda was informed that he would be laid off on August 5, 1986. He continued as an employee of CBS until August 29, 1986. After the lay-off, Berda hoped for a time to be recalled by CBS, but was not. He returned to Pittsburgh and formed Berda Communications; Linda Berda returned to Pittsburgh and teaching, but later took a higher paying job in another field. Pretrial Stipulation, Plaintiffs' Statement of Facts and Legal Theories and Damages; Stipulation.

Plaintiffs filed a three-count complaint in the Court of Common Pleas of Allegheny County on January 19, 1988, asserting that CBS was liable to plaintiffs for fraud and negligent misrepresentation, for breach of contract, and for loss of consortium. Plain-

---

1. If it were necessary to reach these matters, I would deny both motions on the merits. This is a short, simple matter for trial and bifurcation is not appropriate. The motion to amend the complaint is solely a device for remedying an oversight in demanding a jury trial, and is unnecessary. This judge's invariant practice has been simply to grant requests for jury trial on motion under Fed.R.Civ.P. 39(b).

2. From the text of Berda's letter, and from the timing of the negotiations between Local 5 and WPXI, it appears that Martin Berda wrote to CBS before he became a shop steward at WPXI because he had learned in the course of contract negotiations between Local 5 and WPXI that WPXI was considering lay-offs of personnel. Stipulation; Berda deposition at 53, 72, 92; Berda deposition, Exhibit 13.

tiffs based their action for fraud on the allegations that Franks and Heiges represented to Martin Berda that if he accepted employment at CBS, he would not face any lay-off in the foreseeable future, and that he would have job security at least equal to that at WPXI. The plaintiffs based their action for breach of contract on the allegation that the representations by Franks and Heiges constituted a contractual term supplemental to the collective bargaining agreement that Berda would not be laid off for a reasonable time following his acceptance of employment at CBS. The plaintiffs based their action for loss of consortium on the claim that they had been deprived of each other's companionship and services by the defendant's actions.

Defendant CBS removed the action to this Court on February 25, 1988, and moved to dismiss the complaint because the common law causes of action were allegedly preempted by federal labor law. This Court, per Honorable Hubert I. Teitelbaum, ordered dismissal of the plaintiffs' complaint on June 15, 1988. The Court of Appeals for the Third Circuit reversed that Order on July 20, 1989. *Berda v. CBS, Inc.*, 881 F.2d 20 (3d Cir.1989), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990). The matter was assigned to this judge for further proceedings, and after discovery defendant CBS filed its motion for summary judgment on September 4, 1990.

■ I turn first to Count III, plaintiffs' claim for consortium. Plaintiffs do not address the defendant's objection to a claim for consortium in their Reply Brief in Opposition to Defendant CBS's Reply Brief, and their argument in their principal brief is reproduced in its entirety herein:

> Fraud is a dignitary tort. *Schuster v. Clark*, 50 Pa.Super. 459 (1912). A loss of consortium follows such a claim. Mrs. Berda, of course, has her own claims for

fraud, negligent misrepresentations and promissory estoppel against CBS because she could justifiably rely on what her husband reported to her about negotiations with CBS.

Plaintiffs' Reply Brief at 18. Not only does *Schuster v. Clark* not contain the proposition for which it is cited—indeed it is never made clear what a "dignitary tort" is—that case is not even relevant to the issue of consortium because no claim for consortium is discussed by the Superior Court in that opinion.

■ At common law, consortium originally was a property interest possessed by a husband in the services, particularly relating to sex and to childbearing, of his wife. In modern times, it has become a cause of action which married spouses have for deprivation of the "aid, assistance, comfort and society" one spouse is expected to render to the other. *Hopkins v. Blanco*, 224 Pa.Super. 116, 302 A.2d 855, 856 (1973), *aff'd*, 457 Pa. 90, 320 A.2d 139 (1974). Consortium remains grounded in the concept of loss of the spouse's services, however broadly construed, with its implicit requirement that injury, whether physical or mental, be to the *person* of the spouse. *See Burns v. Pepsi–Cola Metropolitan Bottling Co.*, 353 Pa.Super. 571, 510 A.2d 810, 812 (1986); *see also Cappiello v. Ragen Precision Industries, Inc.*, 192 N.J.Super. 523, 471 A.2d 432, 437 (1984) (explicitly holding under New Jersey law that consortium not available in tort of wrongful discharge). No court to our knowledge has awarded damages under Pennsylvania law [3] in the absence of a tangible personal injury to a spouse. *See e.g. Murray v. Commercial Union Insurance Co.*, 782 F.2d 432 (3d Cir.1986); *Browne v. Maxfield*, 663 F.Supp. 1193, 1207 (E.D. Pa. 1987); *see also Quitmeyer v. SEPTA*, 740 F.Supp. 363, 370 (E.D.Pa.1990) (federal civil rights). I do not predict that Pennsylva-

---

**3.** The plaintiffs assert that Pennsylvania law controls. The defendant argues that Pennsylvania and District of Columbia law are substantively identical. In the absence of a claim that another forum has more significant contacts, I have addressed plaintiffs' claims under Pennsylvania law. Plaintiffs argue that Pennsylvania law is more favorable with respect to the fraud claim. *See* letter of June 27, 1991. In either case, my discussion of Pennsylvania law is at least as favorable to the nonmoving parties as an examination of their claim under District of Columbia precedent.

nia's Supreme Court would make such a novel departure from the settled state of the law. Because the injuries allegedly suffered by plaintiffs are purely pecuniary, I dismiss Count III for failure to state a claim.[4] Fed.R.Civ.P. 12(b)(6).

■ In order for CBS to prevail on its motion for summary judgment, on Counts I and II of plaintiffs' Complaint, it must show: (1) that there is no genuine issue as to any material fact, and (2) that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). In determining whether an issue of material fact does exist, all reasonable inferences must be drawn against the moving party. *See White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir.1988). A fact is "material" if proof of its existence or non-existence would affect the outcome of the lawsuit under the law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227, 1233 (3d Cir. 1988). An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514. The motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986).

■ The elements of a common law claim for fraudulent misrepresentation are (1) a misrepresentation of fact; (2) communication of that misrepresentation; (3) intent by the defendant that the plaintiff will be induced to act in reliance on the misrepresentation; (4) justifiable reliance by the plaintiff on the misrepresentation; and (5) damages proximately caused by the reliance. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983).

■ CBS argues, citing *Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 319 (3d Cir.1989), that because fraudulent misrepresentation requires the misrepresentation of an existing fact, the statements alleged to have been made by Franks and Heiges concerning future job security and prospects for future layoffs at CBS cannot be statements of existing facts. *See also LaScola v. US Sprint Communications*, 946 F.2d 559, 568 (7th Cir.1991). Pennsylvania law, however, does recognize that a false statement of intent regarding future actions can be fraudulent. *Mellon Bank Corp. v. First Union Real Estate*, 750 F.Supp. 711, 717 (W.D.Pa.1990), *aff'd*, 951 F.2d 1399 (3d Cir.1991). If an agent of CBS falsely stated to Martin Berda that CBS would not be laying off personnel in the future when that agent knew that CBS would be, or even was likely to be laying off personnel, that could constitute a fraudulent misrepresentation. Therefore, in evaluating the motion for summary judgment on the fraud claim, it is necessary to examine both what was stated to Berda and the state of knowledge of the agents of CBS who made the statements.

The parties are in agreement that the evidence concerning alleged promises of job security by CBS to Martin Berda is contained in the description of the February 27, 1986, interviews between Martin Berda, Emil Franks, and M. Lynwood Heiges.[5] On February 27, 1986, Berda met first

---

4. I also dismiss Linda Berda's claims for fraud and breach of contract asserted under Counts I and II of plaintiff's complaint for failure to state a claim. Despite plaintiffs' argument that Linda Berda has claims for fraud and breach of contract because "she could justifiably rely on what her husband reported," Linda Berda's claims are legally insubstantial because there is no claim that CBS ever attempted to induce her to do anything or ever made an offer of a contract of employment to her. The detriment, in the colloquial sense, that she undoubtedly experienced when her husband lost his employment cannot by semantic sleight of hand be transformed into detrimental reliance, offer, or acceptance of a contract, nor supply the intent to induce reliance element necessary for a fraud claim.

5. Franks was the Technical Manager, Studio/Field, for CBS Inc.'s Operations and Engineering Division in Washington, D.C.; Heiges was Director of Administration and Facilities in Washington, D.C. CBS, Inc. was divided into divisions responsible for producing different

with Franks. During his interview, he expressed what Franks remembers as an above average interest in job security. Franks deposition, 54–57. Berda asked Franks "if I had to worry about any kind of layoffs here." Berda deposition, 84. Franks' response was, "The likelihood of being laid off is very remote." *Id.* The interview moved on to other topics, and concluded with Franks accompanying Berda to Heiges' office. During Heiges' interview, Berda again raised the issue of job security, and said that it was one of his primary concerns. Heiges response, according to Berda, was to look at Franks and ask something similar to "Do we ever have a layoff, Emil." Heiges then went on to state that there had been a layoff in 1975, and concluded with the statement "You don't have to worry about layoffs here at CBS." *Id.,* 85. The interview went on to other topics such as salary.[6]

I find as a matter of law that neither Franks nor Heiges's statements constituted statements of present fact or intention and that Berda is unjustified in claiming that he treated them as if they were. Casual remarks prefaced with phrases such as "you don't have to worry," or qualified by suffixes like "the chances are remote" are understood to be expressions of opinion and not assurances of fact. This is more especially true in formal discussions such as pre-hire interviews and other contract negotiations. *See Josephs v. Pizza Hut of America, Inc.,* 733 F.Supp. 222 (W.D.Pa. 1989), *aff'd mem.,* 899 F.2d 1217 (3d Cir. 1990); *Mellon Bank Corp. v. First Union Real Estate, supra.* Here, Berda and CBS, Inc. were operating at arms length, each with a desire but no need to conclude an employment contract with the other. Further, Berda's position as a shop steward meant that he was aware that if there were a layoff, the most recent hires would be the first to be laid off, Berda deposition, 89, yet Berda did not follow up on his single reference to the subject of layoffs. One need only compare Berda's discussion with Franks about Berda's starting salary to note Berda's ability to recognize the difference between statements of fact and sentiments. *Compare* Berda deposition, 86, 105–07 (following up issue of salary), with *id.,* 84–85 (references to layoffs).

■ Berda's fraud claim fails for the second reason that there is no evidence of record that, at the time Franks and Heiges interviewed Berda, either of them was aware that the CBS Nightwatch program's format was about to be changed, or learned of the resultant plan to lay off several technicians until well after Berda had quit his job in Pittsburgh with WPXI and began work for CBS, Inc.[7]

The decision in the Operation and Engineering division to lay off technicians was directly caused by a format change in the News division's Nightwatch program. Nightwatch originally had been produced in New York, but had been relocated to Washington, D.C. in 1984 to save money, apparently because its format featured interviews with public officials mostly located in Washington, D.C. *See* Badler deposition, 19, 32. Throughout the New York phase of its history and into April, 1986, when Berda began working at Operations and Engineering, Nightwatch interviews were taped at night, with technical assistance and editing being done immediately

---

types of programs; for example, news was produced by the CBS News Division, while sports programming was produced by the CBS Sports Division. Each of the divisions received technical support and production assistance from the Operations and Engineering Division. Heiges deposition, 16–17; Franks deposition, 18–20.

6. For purposes of this motion, Berda's account must be accepted even if there were conflicting versions of the interviews. Franks and Heiges did give substantially similar accounts of the conversations, however. Franks deposition, 53–60; 104. Heiges deposition, 26.

7. To meet their burden of proving a material issue of fact, plaintiffs must present evidence from which a jury could find by "clear, precise, and indubitable" evidence, *Glanski v. Ervine,* 269 Pa.Super. 182, 409 A.2d 425, 430 (1979) that Franks or Heiges knew that their statements were false, or that they made their statements with reckless disregard for the truth. *Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282, 286 (1985). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252–54, 106 S.Ct. at 2512–13 (evaluation of evidence must be made in light of applicable burden of proof).

afterwards so that the program could air in its 2 a.m.–4 a.m. and 4 a.m.–6 a.m. time slots. Badler deposition, 34. In 1986, the top management at CBS, Inc. changed, Franks deposition, 73, and at the same time there was increasing pressure to cut production costs in the Nightwatch program. Badler deposition, 19, 54. Discussions began in February or March, 1986, between John Huddy, then executive producer of Nightwatch, Jack Smith, with the news division, and Herman Badler, then general manager and later vice president of Operations and Engineering in Washington, D.C. *See* Badler deposition at 33. These discussions led to the idea of changing the format of Nightwatch to a show that could be produced during the daytime, taped, edited and run at night. The evidence of record indicates that this idea was first discussed in March or April, 1986. Badler deposition, 36–37. Franks and Heiges were made aware of this idea and their advice was sought on how to produce Nightwatch using the daylight technical staff. *Id.*, 38. The proposal to alter the production format, sacrificing some timeliness for economy, was discussed with the corporate management between March or April, 1986, and approximately July, 1986, *id.* 37–38, when the plan was approved. Once approval for the format change was granted, Heiges decided that nine technicians from the Operations and Engineering division would be laid off. Heiges deposition, 40–41. The layoffs were conducted in reverse order of seniority, pursuant to the collective bargaining agreement. Berda was familiar with this agreement, having been shop steward under a similar contract at WPXI, and knew that as a recent hire he was most exposed if there were any layoffs. Berda deposition, 49, 53, 89.

From the evidence, taking the earliest dates estimated by Badler, and hence the dates most damning of CBS's position, the discussions concerning the cost cutting at Nightwatch began in February, 1986, and were communicated to Franks and Heiges in March, 1986, after the February, 1986 interviews with Berda.[8] At some point in

March, 1986, the proposal to change the format of Nightwatch was first discussed with management, and on March 14, 1986, Berda was offered and accepted a position with CBS. Throughout the rest of the spring and into the summer of 1986, the possibility of changing the format for Nightwatch was discussed between New York and Washington. This simply does not show knowledge that the statement that "layoffs were unlikely," even if it constituted a representation of fact, was known by Franks and Heiges to be false at the time of the February interview, at the time of the March offer and acceptance, or at the time of the April 14 starting date with CBS. Nor does it even show knowledge by Franks or Heiges that layoffs were likely at any time prior to New York's approval of the format change in the summer of 1986.

Plaintiffs' argument that because someone in CBS, Inc. had knowledge of the proposed format change, CBS, Inc. is guilty of fraud for failing to disclose the prospect of possible layoffs to Berda rests on the notion that upper management of a large corporation has a duty to discuss significant corporate plans with the employees who may ultimately be affected. Appealingly populist as this is, it is simply not the law.

Two other historical events at CBS' Washington division are advanced by plaintiffs to support the claim that Franks and Heiges' statements were representations and were known to be fraudulent. First, plaintiffs note that CBS instituted an early retirement program in 1985 in the Operations and Engineering department, although plaintiffs concede that there were no layoffs. Second, plaintiffs cite a six percent staff reduction target implemented in June, 1986. Badler deposition, 26–28, 31–32. The six percent staff reduction, although discussed within CBS, Inc. at the end of 1985, and therefore presumably known to Franks and Heiges at the time of the interview, was achieved by five early retirements and the layoff, in June, 1986,

8. Heiges and Franks put the date of their discovery of prospective layoffs in late spring or summer of 1986. Franks deposition, 29–30, 73–75; Heiges deposition, 38.

of one stage hand. No technicians were affected. Badler deposition, at 27. To say that Franks and Heiges knew that their statements in February, 1986 about layoffs being unlikely were false because of these early retirement programs is, at best, to offer a red herring.

■ Finally, plaintiffs assert that because Franks and Heiges acknowledged hearing rumors about Nightwatch being canceled or restructured they had a duty to investigate and disclose those rumors to Berda. This is absurd, without more.

■ Plaintiffs base their breach of contract claim on the argument that because the plaintiffs gave up their jobs in Pennsylvania to work in Washington, D.C., that Franks and Heiges' statements constitute a contract provision for employment for a reasonable period of time. Plaintiffs confuse the concepts of offer and acceptance with consideration. If Franks and Heiges' statements constituted an offer of a contractual provision of employment for a reasonable period of time, Berda accepted that by taking the job,[9] without the requirement of additional consideration. If no offer was made of employment for a set period of time, the hardship involved in moving from Pittsburgh to Washington, D.C. would not create that term of employment.[10] *See Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571, 579–80 (1986).

■ The question is whether Heiges and Franks' statements constitute an offer of employment for a certain time period, or for an indefinite but reasonable time period, suggested by plaintiffs to be approximately five years. *See* Pretrial Stipulation, 7–8. The answer is that, under Pennsylvania law, indefinite assurances such as those allegedly made by Franks and Heiges cannot be construed as offers. *Murray v. Commercial Union Ins. Co.*, 782 F.2d at 435; *Clay v. Advanced Computer Applications*, 370 Pa.Super. 497, 536 A.2d 1375, 1383 (1988) (en banc), *rev'd in part on other grounds*, 522 Pa. 86, 559 A.2d 917 (1989). The words were not spoken in the form of an offer, but rather as a response to a question by Berda, a response that Berda did not follow up on. Nor do the words have any definite meaning that would allow their enforcement.[11] This is fatal to a breach of contract claim. *Linnet v. Hitchcock*, 324 Pa.Super. 209, 471 A.2d 537, 540 (1984).

Summary judgment is entered for defendant. The Clerk shall mark this matter CLOSED.

---

**9.** I leave aside for purposes of this motion questions of the applicability of the parol evidence rule and whether Berda accepted an integrated contract in accepting the collective bargaining agreement.

**10.** The citation of cases which provide that under certain circumstances valuable additional consideration by an employee will modify an at will contract to one terminable only for cause is quite beside the point. Berda was not an at will employee. To suggest that he was an employee under the collective bargaining agreement with a supplemental oral contract derived from modification of the at will doctrine is to cobble together legal principles simply for the sake of a result.

**11.** What time period of employment is connoted by "You don't have to worry about layoffs here"? The purely speculative nature of the response "a reasonable time" indicates why this is not a contractual term. *Cf. Browne v. Maxfield*, 663 F.Supp. at 1197–98 (contract for salary "between $75,000 and $125,000" sufficiently definite to support finding that salary below $75,000 constitutes a breach).